# MINNESOTA CIVIL LIBERTIES UNION AND OTHERS v. STATE AND OTHERS. MINNESOTA COORDINATING COMMITTEE FOR PUBLIC EDUCATION AND OTHERS v. STATE AND OTHERS. LOUIS QUAST AND OTHERS, INTERVENORS. JAMES P. LARKIN AND OTHERS, INTERVENORS.*

224 N. W. 2d 344.

November 26, 1974—No. 43978.

* Certiorari denied, 421 U.S. 988, 95 S. Ct. 1990, 1991, 44 L. ed. 2d 477 (1975).

*Lynn S. Castner,* for appellants Minnesota Civil Liberties Union and others.

*William B. Korstad* and *Leo Pfeffer,* for appellants Minnesota Coordinating Committee for Public Education and others.

*Warren Spannaus,* Attorney General, and *John R. Kenefick* and *Edwin P. Lee,* Special Assistant Attorneys General, for respondents state and others.

*Meier, Kennedy & Quinn* and *Timothy P. Quinn,* for intervenor respondents Louis Quast and others.

*David W. Louisell* and *Daniel A. Utter,* for intervenor respondents James P. Larkin and others.

TODD, JUSTICE.

Plaintiffs appeal from an order denying them a new trial and from judgment of the district court declaring constitutional L. 1971, c. 944, "Nonpublic School Education Costs; Credit," on the grounds that the statute is violative of the United States Constitution and of the Minnesota Constitution. The statute in question provides tax credits for parents of children attending nonpublic schools. The trial court in thorough, thoughtful, and comprehensive findings of fact, conclusions of law, and memorandum found the statute to be constitutional under the law as then interpreted by the United States Supreme Court and this court. Plaintiffs have secured several extensions of time to file briefs while this appeal was pending. These extensions have proven most beneficial to this court as subsequent decisions of the United States Supreme Court have modified and narrowed the decisions upon which the trial court based its opinion. The net effect of those decisions is to necessitate a reversal of the trial court and a holding that the statute in question is unconstitutional.

The 1971 session of the Minnesota Legislature addressed itself to the problem of the financial plight of the parents exercising their constitutional rights to send their children to nonpublic schools. It sought a means to reduce their burden, to promote the state interest in maintaining such plurality of educational opportunity, and to prevent the demise of such nonpublic schools with the substantial burden being immediately cast upon the taxpayers of the state. In response to this challenge, the legislature, after extensive hearings, passed L. 1971, c. 944 (Minn. St. 290.086). This legislation, as will be noted, seemed to meet the then existing constitutional standards applicable to such types of assistance.

Chapter 944, signed into law by the governor on June 7, 1971, was applicable to taxable years beginning after December 31, 1970. Briefly stated, the statute provides a tax credit on the state income tax of parents or legal guardians of children in kindergarten, elementary, and secondary nonpublic schools. The credit may only be claimed by those who have previously paid the nonpublic school educational costs or present proof of payment and who do not claim a deduction under Minn. St. 290.09, subd. 22.[1] The child or ward must attend a "nonpublic school", any elementary or secondary school, other than a public school, located in Minnesota, wherein a resident may fulfill the compulsory attendance law, which is not operated for profit, and which adheres to the provisions of the Civil Rights Act of 1964. Minn. St. 290.086, subd. 3.

The trial court found that the amount of the credit pursuant to Minn. St. 290.086, subd. 5, for the calendar years 1971 and 1972 is the least of the following amounts:

"(a) $50.00 for a kindergarten student, $100.00 for an ele-

---

1 Minn. St. 290.09, subd. 22, allows a deduction from gross income of the amount paid for tuition and cost of transportation in attending an elementary or secondary school, not to exceed $200 for each dependent.

mentary school student, and $140.00 for a secondary school student, limited by the number of months the child is enrolled,

"(b) the amount paid by the parents for education cost, or

"(c) the restricted maintenance cost per pupil unit in average daily attendance, multiplied by the percentage of average public school state foundation aid, limited to the number of months the child was enrolled."

The trial court further found that for 1973 and each succeeding calendar year, the maximum credit allowed by Minn. St. 290.086, subd. 5, will be the least of the following:

"(a) the average public school state foundation aid per pupil unit for 1973, divided by the same figure for 1972, multiplied by $50.00 for a kindergarten student, $100.00 for an elementary school student, and $140.00 for a secondary school student, limited by the number of months the child is enrolled,

"(b) the amount paid by the parents for education costs, or

"(c) the restricted maintenance cost per pupil unit in average daily attendance multiplied by the average public school state foundation aid, limited to the number of months the child was enrolled."

The average public school state foundation aid percentage is the percentage of average state foundation aid per pupil unit in average daily attendance for Minnesota public elementary and secondary schools in relation to the average state and local maintenance cost per pupil unit in average daily attendance for the school year. This figure is determined by the Department of Education on or before October 1 of each year.

Education cost includes tuition, classroom instructional fees, and textbooks, excluding texts or materials used in the teaching of religious tenets, doctrine, or worship. Minn. St. 290.086, subds. 2 and 4. Maintenance cost has the same meaning for public and nonpublic elementary and secondary schools.[2] In computing the

[2] Maintenance cost is defined in Minn. St. 1969, § 124.211, subd. 2(5): "(5) Actual total debt redemption and maintenance cost per pupil unit

tax credit maintenance cost in the nonpublic school is in all cases reduced by 20 percent and thus designated "restricted maintenance cost." Minn. St. 290.086, subd. 1.

To receive the tax credit, the parent or guardian must obtain a prepared form NSRC from the nonpublic school indicating the maximum allowable tax credit per pupil for each month of enrollment. Schedule NSC is filled out to determine the individual tax credit. Both are attached to the individual income tax return. Form NSRC-1 is the backup to form NSRC and is prepared by the nonpublic school and submitted to the Department of Taxation. NSRC-1 reflects the determination of maintenance, adjusted maintenance, restricted maintenance cost figures, and the maximum allowable credit. See, Minn. St. 290.086, subd. 7. The credit is applied dollar for dollar against the claimant's state income tax liability and if it exceeds the taxes due, the amount of the credit is paid to the claimant the same as a refund for overpayment. Minn. St. 290.086, subd. 6.

On August 24, 1971, plaintiffs Minnesota Civil Liberties Union, Americans United for Separation of Church and State, and 7 Minnesota taxpayers commenced an action against the state, certain state officials, and private school officials in the District Court of Ramsey County. On September 17, 1971, plain-

---

in average daily attendance for the purpose of this section shall mean the sum of the cost per pupil unit in average daily attendance for payments on principal and interest of bonded debt and maintenance exclusive of transportation, expenditures for junior colleges, veterans training program, community services, and receipts from the sale of other items sold to the individual pupil by the school such as lunches, paper, workbooks, and other materials used in the instructional program, and receipts from quasi-school activities when the school board has assumed direction and control of same; provided, that for the 1965-1966 school year it shall mean the 1964-1965 total debt redemption and maintenance cost per pupil unit in average daily attendance as indicated in this clause and for years to follow it shall mean the total debt redemption and maintenance cost per pupil unit in average daily attendance in the previous year."

tiffs Minnesota Coordinating Committee for Public Education, School Administrators of Minnesota, Minnesota Education Association, Minnesota Federation of Teachers, Minnesota Association of Secondary Principals, Minnesota Elementary School Principals Association, Minnesota Congress of Parent and Teachers Association, American Jewish Congress, Jewish Community Relations Council of Minnesota, First Unitarian Society of Minneapolis, Minnesota Conference of Seventh Day Adventists, and 17 Minnesota taxpayers commenced a second action against the state and certain state officials. The two actions were consolidated for trial on February 1, 1972. A motion for a temporary restraining order preventing defendants from proceeding to allow the tax credits for the current tax year was denied and trial was commenced on March 1, 1972. On July 6, 1972, the court found the statute to be constitutional. Judgment was entered for defendants on July 10, 1972. Plaintiffs' motion for amended findings of fact, conclusions of law, or a new trial was denied on September 12, 1972. Plaintiffs appealed from the judgment and order denying their motion on September 29, 1972.

Plaintiffs sought relief in this court restraining defendants from permitting the allowance of tax credits on the ensuing taxable years pending determination of the appeal. These motions were denied.

Plaintiffs allege 14 separate assignments of error in this appeal. For purposes of disposition of this case, they may be summarized as follows: (A) Does L. 1971, c. 944, violate the Establishment Clause of the First Amendment of the United States Constitution? (1) Does c. 944 have a secular legislative purpose? (2) Does c. 944 have a principal effect of advancing religion? (3) Does c. 944 create and foster impermissible entanglement of government with religion and religion with government? (B) Does c. 944 violate provisions of the Minnesota Constitution and various other provisions of the United States Constitution?

In addition, plaintiffs ask us now also to review L. 1974, c. 556, § 20, which amends Minn. St. 1971, § 290.086, by adding the following subdivision:

"Subd. 9. The commissioner shall not require reimbursement or restitution of any such credits or refunds previously granted, where such recipients were legally entitled thereto under laws in effect at the time such claim was filed by the applicant, or to seek recovery of any such amounts by legal action."

In disposing of plaintiffs' challenges to the statute in question, we must necessarily first determine the Federal constitutional issues before arriving at any consideration of State constitutional issues. The First Amendment to the United States Constitution provides in part:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof * * *."

The scope of this constitutional prohibition and guarantee has been best summarized by Mr. Chief Justice Burger in Walz v. Tax Commission, 397 U. S. 664, 668, 90 S. Ct. 1409, 1411, 25 L. ed. 2d 697, 701 (1970):

"The Establishment and Free Exercise Clauses of the First Amendment are not the most precisely drawn portions of the Constitution. The sweep of the absolute prohibitions in the Religion Clauses may have been calculated; but the purpose was to state an objective not to write a statute. In attempting to articulate the scope of the two Religion Clauses, the Court's opinions reflect the limitations inherent in formulating general principles on a case-by-case basis. The considerable internal inconsistency in the opinions of the Court derives from what, in retrospect, may have been too sweeping utterances on aspects of these clauses that seemed clear in relation to the particular cases but have limited meaning as general principles.

"The Court has struggled to find a neutral course between the two Religion Clauses, both of which are cast in absolute terms, and either of which, if expanded to a logical extreme, would tend to clash with the other. * * *

* * * * *

"The course of constitutional neutrality in this area cannot be an absolutely straight line; rigidity could well defeat the basic purpose of these provisions, which is to insure that no religion be sponsored or favored, none commanded, and none inhibited."

To properly dispose of plaintiffs' challenge to the statute in question, to evaluate the trial court's disposition of this case, and to justify the conclusion reached by the court at this time, it is necessary that we briefly summarize the most recent decisions of the United States Supreme Court interpreting this difficult section of the Federal Constitution.

One of the earlier challenges of aid to nonpublic education arose in Everson v. Board of Education, 330 U. S. 1, 67 S. Ct. 504, 91 L. ed. 711 (1947). In that case, a statute which permitted local school boards to contract for the transportation of children to and from schools other than private schools operated for profit was challenged. A New Jersey school board, proceeding under such statutory authority, authorized reimbursement to parents for fees paid to public carriers by children attending nonpublic schools. A bare majority of the Supreme Court held that the expenditure of tax funds for transportation of nonpublic school students was constitutionally permissible as a general health and safety measure. The court there said (330 U. S. 15, 67 S. Ct. 511, 91 L. ed. 723):

"The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. * * * No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa.* In the words of Jefferson, the

clause against establishment of religion by law was intended to erect 'a wall of separation between church and State.'"

The court recognized that such transportation aid assisted students in pursuit of their original training but balanced the conflict between the religion clauses of the First Amendment in favor of the Free Exercise Clause, stating (330 U. S. 16, 67 S. Ct. 512, 91 L. ed. 724):

"* * * On the other hand, other language of the amendment commands that New Jersey cannot hamper its citizens in the free exercise of their own religion. Consequently, it cannot exclude individual Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Non-believers, Presbyterians, or the members of any other faith, *because of their faith, or lack of it,* from receiving the benefits of public welfare legislation."

Having seemingly embraced the Jeffersonian wall-of-separation concept, the court then slowly began to retreat from such an absolute position. In Zorach v. Clauson, 343 U. S. 306, 72 S. Ct. 679, 96 L. ed. 954 (1952), the court sustained the constitutionality of a released-time program whereby public school students in New York, upon presentation of written requests from their parents, were released from class before the close of the public school day so they could attend religious classes or services outside the public school premises. In 1963, in Abington School Dist. v. Schempp, 374 U. S. 203, 83 S. Ct. 1560, 10 L. ed. 2d 844 (1963), the court in reviewing and declaring unconstitutional a Pennsylvania law which required Bible reading in the public school classrooms and a Baltimore rule which mandated reading of the Lord's Prayer, laid down for the first time guidelines for weighing legislation challenged under the Establishment Clause. The court there said (374 U. S. 222, 83 S. Ct. 1571, 10 L. ed. 2d 858):

"* * * The test may be stated as follows: what are the *purpose* and the *primary effect* of the enactment? If either is the

advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution." (Italics supplied.)

Later, in Board of Education v. Allen, 392 U. S. 236, 88 S. Ct. 1923, 20 L. ed. 2d 1060 (1968), the court sustained a statute authorizing local school boards to furnish secular textbooks to all students including these attending private schools. The court reasoned that the benefits which proceeded directly to the student or to his parents and were merely indirect benefits to the parochial schools, had a secular legislative purpose and a primary effect that neither advanced nor inhibited religion.

In Walz v. Tax Commission, *supra,* the court upheld the granting of tax-exempt status to church-affiliated schools, as well as to other charitable and nonprofit corporations. In passing on the constitutionality of the statute, the court restated the secular purpose and primary effect criteria of Abington School Dist. v. Schempp, *supra,* and added a new criterion. The court said (397 U. S. 674, 90 S. Ct. 1414, 25 L. ed. 2d 704):

"* * * We must also be sure that the end result—the effect—is not an excessive government entanglement with religion."

This "entanglement test" was described as one of degree. The court also recited at some length the historic precedent of the tax-exempt status of religious institutions and dwelt on the prohibitive effect of taxation upon the free exercise of religion.

Thus, there had emerged from the Supreme Court of the United States a three-part standard for analyzing questions arising under the Establishment Clause of the First Amendment: (1) A statute must have a secular legislative purpose; (2) a statute's principal or primary effect must be one that neither advances nor inhibits religion; and (3) a statute must not foster excessive governmental entanglement with religion.

In 1971, the United States Supreme Court decided three cases—Tilton v. Richardson, 403 U. S. 672, 91 S. Ct. 2091, 29 L. ed. 2d 790 (1971); Lemon v. Kurtzman, 403 U. S. 602, 91

S. Ct. 2105, 29 L. ed. 2d 745 (1971); and Earley v. DiCenso, 403 U. S. 602, 91 S. Ct. 2105, 29 L. ed. 2d 745 (1971). In Kurtzman, the court struck down a Pennsylvania statute which gave direct subsidies to nonpublic schools. In DiCenso, the court held invalid a Rhode Island statute which supplemented the salaries of nonpublic school teachers who taught only secular subjects in secondary and elementary schools. In Tilton, the court sustained a Federal statute which provided aid to church-related colleges and universities for construction of buildings and facilities to be used exclusively for secular educational purposes. In each case the crux of the court's analysis dealt with the issue of entanglement.

In each of the cases the court had little difficulty in passing over the issue of secular purpose, and in disposing of the primary effect test, Mr. Chief Justice Burger said in Tilton (403 U. S. 679, 91 S. Ct. 2096, 29 L. ed. 2d 799):

"* * * [T]he crucial question is not whether some benefit accrues to a religious institution as a consequence of the legislative program, but whether its principal or primary effect advances religion."

It is against this background that the trial court herein took evidence and evaluated the arguments of the parties. The trial court found that the statute had a valid secular purpose. We are in accord with that holding. The trial court also found that the statute survived entanglement challenges. A great deal of the trial court's lengthy and learned memorandum dealt with the disposition of the entanglement question. Finally, the trial court found that the primary effect of the statute was not to promote the establishment of religion. Absent subsequent decision of the Supreme Court, such a finding was fully justified under the standards established by the Supreme Court in Tilton v. Richardson, *supra*.

However, during the pendency of this appeal, a series of decisions was announced by the Supreme Court of the United States

which effectively changed the course and standard of measurement of establishment questions. On June 25, 1973, the following decisions were handed down by the United States Supreme Court: Committee for Public Education v. Nyquist, 413 U. S. 756, 93 S. Ct. 2955, 37 L. ed. 2d 948 (1973); Sloan v. Lemon, 413 U. S. 825, 93 S. Ct. 2982, 37 L. ed. 2d 939 (1973); Levitt v. Committee for Public Education, 413 U. S. 472, 93 S. Ct. 2814, 37 L. ed. 2d 736 (1973); Hunt v. McNair, 413 U. S. 734, 93 S. Ct. 2868, 37 L. ed. 2d 923 (1973).

In Nyquist, Mr. Justice Powell wrote for a 6-judge majority with Mr. Chief Justice Burger dissenting in part, Mr. Justice Rehnquist dissenting in part, and Mr. Justice White dissenting from the entire opinion. The court considered a New York statute which provided three forms of assistance to nonpublic education: Direct payments to the schools for maintenance costs according to a statutory formula; direct payments to low-income parents; and indirect assistance by means of tax benefits to middle-income parents. With the exception of Mr. Justice White, the entire court disposed of the direct payments to the schools for maintenance costs as violative of previous pronouncements of the court. However, in considering the remaining portions of the New York statute, the United States Supreme Court took what in retrospect amounts to a rather sharp turn in the line of decisions regarding First Amendment problems.

Mr. Justice Powell, writing for the majority in Nyquist, reiterated the three-part test that emerged from previous decisions. In discussing the applications of these tests, he quoted in a footnote the language of Mr. Chief Justice Burger in Tilton v. Richardson, 403 U. S. 672, 677, 91 S. Ct. 2091, 2095, 29 L. ed. 2d 790, 798, where he said (413 U. S. 773, note 31, 93 S. Ct. 2965, 37 L. ed. 2d 963):

"* * * '[T]here is no single constitutional caliper that can be used to measure the precise degree' to which any one of them is applicable to the state action under scrutiny. Rather, these

tests or criteria should be 'viewed as guidelines' within which to consider 'the cumulative criteria developed over many years and applying to a wide range of governmental action challenged as violative of the Establishment Clause.' "

The court had little trouble in finding a secular purpose for the legislation, however. Mr. Justice Powell added (413 U. S. 774, 93 S. Ct. 2966, 37 L. ed. 2d 963):

"But the propriety of a legislature's purposes may not immunize from further scrutiny a law which either has a primary effect that advances religion, or which fosters excessive entanglements between Church and State."

In evaluating these various legislative enactments, the court then gave its principal consideration to their primary effect. Considering the maintenance portion of the statute, the court said (413 U. S. 777, 93 S. Ct. 2968, 37 L. ed. 2d 965):

"* * * [T]he statute does provide a sort of statistical guarantee of separation by limiting grants to 50% of the amount expended for comparable services in the public schools. * * * Quite apart from the language of the statute, our cases make clear that a mere statistical judgment will not suffice as a guarantee that state funds will not be used to finance religious education."

The court then referred to the earlier decisions of Earley v. DiCenso, *supra,* and Lemon v. Kurtzman, *supra,* which struck down grants not to exceed 15 percent of a teacher's annual salary and said (413 U. S. 778, 93 S. Ct. 2968, 37 L. ed. 2d 966):

"* * * Although the law was invalidated on entanglement grounds, the Court made clear that the State could not have avoided violating the Establishment Clause by merely assuming that its teachers would succeed in segregating 'their religious beliefs from their secular educational responsibilities.' "

The court held with respect to the maintenance and repair provisions that the effect inevitably was to subsidize and advance reli-

gion, and therefore had no occasion to consider the administrative entanglement aspect of the three-part test.

The court next held that the tuition reimbursement program failed the "effect test" and said (413 U. S. 780, 93 S. Ct. 2969, 37 L. ed. 2d 967):

"* * * In the absence of an effective means of guaranteeing that the state aid derived from public funds will be used exclusively for secular, neutral, and nonideological purposes, it is clear from our cases that direct aid in whatever form is invalid. * * *

* * * * *

"* * * The controlling question here, then, is whether the fact that the grants are delivered to parents rather than schools is of such significance as to compel a contrary result. * * * But those decisions make clear that, far from providing a *per se* immunity from examination of the substance of the State's program, the fact that aid is disbursed to parents rather than to the schools is only one among many factors to be considered."

The court concluded that the effect of the aid was unmistakably to provide desired financial support for nonpublic, sectarian institutions. The State of New York had argued that since its program involved reimbursement of tuition already paid rather than direct contributions, the parent was not a mere conduit, but free to spend the money he received in any manner and, thus, the statute guaranteed statistically the maintenance of neutrality in furthering the free exercise of religion. In response, the court said (413 U. S. 786, 93 S. Ct. 2972, 37 L. ed. 2d 970):

"* * * [I]f the grants are offered as an incentive to parents to send their children to sectarian schools by making unrestricted cash payments to them, the Establishment Clause is violated whether or not the actual dollars given eventually find their way into the sectarian institutions. Whether the grant is labeled a reimbursement, a reward or a subsidy, its substantive impact is still the same."

With regard to the statistical insurances provided in the statute, the court said (413 U. S. 788, 93 S. Ct. 2973, 37 L. ed. 2d 971):

"* * * Obviously, if accepted, this argument would provide the foundation for massive, direct subsidization of sectarian elementary and secondary schools. Our cases, however, have long since foreclosed the notion that mere statistical assurances will suffice to sail between the Scylla and Charybdis of 'effect' and 'entanglement.' "

With regard to the promotion of the free exercise of religion, the court acknowledged the balancing statements of Mr. Chief Justice Burger in Walz v. Tax Commission, *supra,* but then indicated they did not justify an eroding of the limitations of the Establishment Clause now firmly implanted.

The court found little significance in the fact that the money in question in the third section of the legislation was in the form of a tax credit. The court stated it would examine the form of the relationship for the light that it casts on the substance and quoted with approval the dissenting opinion in the court below that (413 U. S. 791, 93 S. Ct. 2975, 37 L. ed. 2d 973) "the money involved represents a charge made upon the state for the purpose of religious education. 350 F. Supp. at 675."

The dissenting opinions expressed some dismay at the majority's apparent attempt to distinguish the Walz decision on the basis of historical precedent of granting tax-exempt status to religious and charitable institutions. However, Mr. Justice White most clearly recognized the real departure from recent precedent when he stated: "* * * But the test is one of 'primary' effect not *any* effect." 413 U. S. 813, 823, 93 S. Ct. 2993, 2998, 37 L. ed. 2d 982, 987.

In answer to the criticisms and objections raised in the dissent, Mr. Justice Powell said (413 U. S. 783, note 39, 93 S. Ct. 2971, 37 L. ed. 2d 969):

"Appellees, focusing on the term 'principal or primary effect' which this Court has utilized in expressing the second prong of

the three-part test, *e.g. Lemon v. Kurtzman, supra,* at 612, have argued that the Court must decide in this case whether the 'primary' effect of New York's tuition grant program is to subsidize religion or to promote these legitimate secular objectives. MR. JUSTICE WHITE'S dissenting opinion, *post,* at 823, similarly suggests that the Court today fails to make this 'ultimate judgment.' *We do not think that such metaphysical judgments are either possible or necessary. Our cases simply do not support the notion that a law found to have a 'primary' effect to promote some legitimate end under the State's police power is immune from further examination to ascertain whether it also has the direct and immediate effect of advancing religion.* In *McGowan v. Maryland, supra,* Sunday Closing Laws were upheld not because their effect was, first, to promote the legitimate interest in a universal day of rest and recreation and only secondarily to assist religious interests. Instead, approval flowed from the finding, based upon a close examination of the history of such laws, that they had only a 'remote and incidental' effect advantageous to religious institutions. *Id.,* at 450. See also *Gallagher v. Crown Kosher Super Market,* 366 U. S. 617, 630 (1961); *Two Guys from Harrison-Allentown, Inc. v. McGinley,* 366 U. S. 582, 598 (1961). Likewise, in *Schempp* the school authorities argued that Bible-reading and other religious recitations in public schools served, primarily, secular purposes, including 'the promotion of moral values, the contradiction to the material trends of the times, and the perpetuation of our institutions and the teaching of literature.' 374 U. S., at 23. Yet, without discrediting these ends and without determining whether they took precedence over the direct religious benefit, the Court held such exercises incompatible with the Establishment Clause. See also 374 U. S., at 278-281 (Brennan, J., concurring). *Any remaining question about the contours of the 'effect' criterion were resolved by the Court's decision in Tilton, in which the Court found the mere possibility that a federally-financed structure might be used for religious purposes 20 years hence was con-*

*stitutionally unacceptable because the grant might 'in part have the effect of advancing religion.'* 403 U. S., at 683.

"It may assist in providing an historical perspective to recall that the argument here is not a new one. The Preamble to Patrick Henry's Bill Establishing a Provision for Teachers of the Christian Religion, which would have required Virginians to pay taxes to support religious teachers and which became the focal point of Madison's Memorial and Remonstrance, see n. 28, *supra,* contained the following listing of secular purposes:

" 'The general diffusion of Christian knowledge hath a natural tendency to correct the morals of men, restrain their views, and preserve the peace of society * * *.' *Everson v. Board of Education,* 330 U. S., at 72 (Supplemental Appendix to dissent of Rutledge, J.). *Such secular objectives, no matter how desirable and irrespective whether judges might possess sufficiently sensitive calipers to ascertain whether the secular effects outweigh the sectarian benefits, cannot serve today any more than they could 200 years ago to justify such a direct and substantial advancement of religion.*" (Italics supplied.)

This court must consider and evaluate L. 1971, c. 944, in the light of the majority opinion of the recent decision of the United States Supreme Court. In applying the three-part test, we have no difficulty, as previously stated, in determining that the secular purpose objective and requirement is met. In applying the "primary effects test," we must be guided by the realization, as indicated above, that this is no longer a primary effects test, but an "any effects" test. Under such a standard, the legislation in question cannot pass constitutional muster. The encompassing language of Nyquist quoted above clearly disposes of all of the arguments raised by respondents which would seek to distinguish this case from the holding of Nyquist. Any doubt that such a result is dictated by the United States Supreme Court decision is resolved by reference to the case of Kosydar v. Wolman, 353 F. Supp. 744 (S. D. Ohio 1972), certiorari denied sub nom. Grit v.

Wolman, 413 U. S. 901, 93 S. Ct. 3062, 37 L. ed. 2d 1021 (1973).[3] This case involved interpretation of a tax credit under Ohio law quite similar to the Minnesota statute. The court stated (353 F. Supp. 766):

"The realigned parties have urged this Court to follow the precedent of Minnesota Civil Liberties Union v. State of Minnesota, Nos. 379526 and 380252 (District Court Ramsey County, Minn., July 6, 1972) which affirmed against state and federal constitutional challenge, a tax credit scheme designed to benefit nonpublic school parents. To the extent, however, the decision of the Minnesota court rested in part on a view of the Free Exercise Clause which we have here rejected, we decline to follow its holding."

While not dealing with all issues raised in this case, the reference to the refusal to follow the Free Exercise Clause disposes of the only possible means of salvaging the legislation under the constitutional mandates of Nyquist and related cases. The majority opinion in Nyquist disregarding the balancing approach of Walz and related cases has chartered a new course, giving clear preference to the Establishment Clause over the Freedom of Exercise Clause of the First Amendment.

Having reached the disposition of this issue on the basis of the primary effect test as it now exists, we need not consider the entanglement issue.

Because of our disposition of the issue upon Federal constitutional grounds, we also need not consider questions raised under the Minnesota Constitution. However, we wish to put to rest any

---

[3] This conclusion is further supported by the summary affirmance by the United States Supreme Court of Franchise Tax Board of California v. United Americans for Public Schools (N. D. Cal.) February 1, 1974 (unreported decision) wherein legislation similar to L. 1971, c. 944, was found to violate the Establishment Clause. Franchise Tax Board of California v. United Americans for Public Schools, 419 U. S. 890, 95 S. Ct. 166, 42 L. ed. 2d 135 (1974).

challenges to the validity of Minn. Const. art. 8, § 2, which provides as follows:

"The legislature shall make such provisions, by taxation or otherwise, as, with the income arising from the school fund, will secure a thorough and efficient system of public schools in each township in the State.

"But in no case shall the moneys derived as aforesaid, or any portion thereof, or any public moneys or property, be appropriated or used for the support of schools wherein the distinctive doctrines, creeds or tenets of any particular Christian or other religious sect are promulgated or taught."

This section was added to our constitution by amendment in 1877 by a vote of 36,780 for, and 16,667 against. At the same election, a total of 98,614 votes were cast for gubernatorial candidates. Respondent Louis Quast challenges this amendment on the ground that it was not properly ratified and thus is not part of the constitution. The trial court analyzed and properly interpreted the applicable constitutional provisions in cases involving these provisions and held that the amendment was properly ratified. We affirm that decision.

We would be remiss if we failed to comment upon the abject failure of our courts and the parties involved in this litigation to recognize that the major problem being dealt with here is society's concern for the children involved. Surely the goal of our society is to provide the best possible educational opportunities to all of our youth. In San Antonio Independent School Dist. v. Rodriguez, 411 U. S. 1, 93 S. Ct. 1278, 36 L. ed. 2d 16 (1973), education was held not to be a fundamental right under the Federal Constitution. We do not now pass on that question under the state constitution. Suffice to say, it should be a proper legislative goal to provide equal opportunity to all children to have available to them the resources of all public school facilities and to avoid the denial of any of these services to them merely on the fact that their parents, in the exercise and control of their chil-

dren, and in the exercise of their freedom of choice and freedom of religion, have chosen to have their children attend classes at a nonpublic school. To deny access to the services and facilities of the public schools on a part-time basis to these students would seem to create a special class of children, namely, those attending public schools, in violation of the tenets of the equal protection of the laws.

Finally, appellants have asked us to review the effect of L. 1974, c. 556, § 20, quoted above. As this question was not before the trial court and is not an issue in this case, such a review would amount to an advisory opinion which we cannot properly give. Seiz v. Citizens Pure Ice Co. 207 Minn. 277, 290 N. W. 802 (1940); Rice v. Austin, 19 Minn. 74 (103) (1872); In the Matter of the Application of the Senate, 10 Minn. 56 (78) (1865).

The judgment is reversed and L. 1971, c. 944, is herewith declared unconstitutional. Neither party shall be allowed costs or disbursements on this appeal.

YETKA, JUSTICE (concurring specially).

Although the majority decision of this court is mandated by the recent opinions of the United States Supreme Court which apparently forbid any direct aid to nonpublic schools, I am compelled to state that there appears to be a sharp departure from past precedent.

It is difficult to perceive the distinction between striking down a tax credit allowed for sending a child to a nonpublic school when that school must follow a state-prescribed curriculum and where no part of the tax credit may be used for the teaching of religion-oriented subjects, and yet, on the other hand, upholding the constitutionality of granting tax-exempt status to churches, and, further, to allow an individual a tax deduction for contributions to his church. This case points out once again that while a strong philosophical argument could be made against all tax exemptions or deductions, this is a province that is better left to legislative determination, not to the courts.

If this recent trend of decisions by the United States Supreme

Court continues to its logical conclusion, the decision of Walz v. Tax Commission, 397 U. S. 664, 90 S. Ct. 1409, 25 L. ed. 2d 697 (1970), appears in jeopardy.

I do not fear that the legislation at issue in the instant case would somehow foster the establishment of any religion. There is a distinction between actively supporting a religion or religions, and offering private education the chance to exist and to be available to all parents—poor or middle class, as well as the wealthy—who choose to exercise the right to send their children to nonpublic schools.

The strict scrutiny that legislation, such as that struck down today, must undergo appears far beyond the degree of protection necessary to insure that our nation will be free from a "state religion" or religious persecution of its citizens. Rather, our legislature appears now to be barred from making any reasonable effort to insure that nonpublic education will survive except for the very wealthy. However, the highest court in our land has spoken, and this court and our legislature must adhere to its word.

MR. CHIEF JUSTICE SHERAN, MR. JUSTICE OTIS, MR. JUSTICE ROGOSHESKE, and MR. JUSTICE MACLAUGHLIN took no part in the consideration or decision of this case.