# MINNESOTA HIGHER EDUCATION FACILITIES AUTHORITY v. RICHARD C. HAWK.

232 N. W. 2d 106.

August 8, 1975—No. 45582.

*John S. Holten, Thomas J. Moore,* and *Faegre & Benson,* for appellant.

*Warren Spannaus,* Attorney General, *Byron E. Starns,* Chief Deputy Attorney General, and *Roderick I. MacKenzie,* Special Assistant Attorney General, for respondent.

*Richard G. Day*, for Minnesota Civil Liberties Union, amicus curiae, seeking reversal.

YETKA, JUSTICE.

Defendant appeals[1] from a judgment entered in Ramsey County District Court declaring the constitutionality of the proposed issuance of tax-exempt revenue bonds by the Minnesota Higher Education Facilities Authority[2] (hereinafter called the Authority) to refinance debts incurred by three private Minnesota colleges in the construction of certain facilities used solely for nonsectarian educational purposes.

We affirm.[3]

The facts are not in dispute.

The Authority is empowered to issue tax-exempt revenue bonds to finance or to refinance construction of "projects" including buildings or facilities for use as dormitories or other student housing facilities, academic buildings, student unions, parking facilities, and other structures required or useful in connection with the operation of *only* accredited nonsectarian, nonprofit educational institutions providing a course of study above the high school level.[4] The Authority is expressly prohibited from constructing, financing, or refinancing—

"* * * any facility used or to be used for sectarian instruction or as a place of religious worship nor any facility which is used or to be used primarily in connection with any part of the program of a school or department of divinity for any religious denomination."[5]

---

[1] The Minnesota Civil Liberties Union has filed an amicus curiae brief urging reversal of the district court judgment.

[2] Created by L. 1971, c. 868, codified as Minn. St. 136A.25-136A.53.

[3] On May 5, 1975, this court issued an order affirming the judgment at issue.

[4] Minn. St. 136A.28(e).

[5] Minn. St. 136A.28(b).

Moreover, the legislation at issue (hereinafter sometimes called the Act) provides that *all* expenses of the Authority are funded *solely* from fees paid by institutions for whom bonds are issued, usually a percentage of bond proceeds.

The financing program established by the Act provides that the Authority will issue bonds and make the proceeds available to the institution which, in turn, will convey title of the financed project(s) to the Authority without cost. The Authority will then lease[6] the project to the institution until the bond obligations are completely satisfied, at which time title of the project is conveyed back to the institution upon payment to the Authority of $500.

The Authority has the right to inspect the institutions receiving financing under the Act in order to insure that the subject "projects" are not being employed for sectarian purposes in violation of the Act.

The advantage of obtaining financing under the Act is the lower interest rates of the bonds due to their tax-exempt status.

In order to obtain financing under the Act, an institution must submit a detailed application,[7] accompanied by exhibits, to the

---

[6] The lease agreement employed by the Authority includes a covenant (Section 5.01) providing in part that the institution "will use and operate the Project at all times as an educational facility, eligible to be and defined as a 'project' under the Act, and not as a facility for sectarian instruction or as a place of religious worship nor primarily in connection with any part of a program of a school or department of divinity for any religious denomination."

The lease agreement (Section 10.05) contains a similar restriction applicable after title to the project has been reconveyed to the institution upon expiration of the lease term. This prohibition against sectarian use applies to the institution for itself "and its successors and assigns," and further provides a right of re-entry by the Authority for breach of this condition.

[7] The application provides information about the institution, including its organization, operation, curriculum, student body, admissions policy, faculty, finances and outstanding debt, a description of the proposed project, and a statement of need for the project.

Authority.[8] This appeal arises from applications submitted to the Authority by St. Mary's College[9] (hereinafter referred to as St. Mary's), Bethel College[10] (hereinafter referred to as Bethel), and the College of St. Teresa[11] (hereinafter referred to as St. Teresa) for refinancing of certain facilities under the Act.

With respect to these institutions (hereinafter collectively referred to as the colleges), the Authority found the facilities sought to be refinanced qualified as "projects"[12] under the Act.

[8] These exhibits include: (1) Certified copies of the articles of incorporation and bylaws of the institution, (2) a statement of the relationship between the institution and any religious organization, and (3) certain other financial information not relevant to the issues raised herein.

[9] The Authority found that St. Mary's College is a nonprofit institution of higher education offering various bachelors and masters degrees in secular programs. It is fully accredited by the North Central Association of Colleges and Secondary Schools. The College's only present relationship to a religious organization is that its articles of incorporation require that at least one-third of its board of trustees be members of the Christian Brothers religious order. The College bylaws also require that the College president be a Christian Brother.

[10] The Authority found that Bethel College (Bethel) is owned and operated by the Baptist General Conference, a nonprofit corporation. Bethel is operated as a nonprofit institution of higher education offering a bachelor of arts degree and is fully accredited by the North Central Association of Colleges and Secondary Schools.

[11] The Authority found the College of St. Teresa to be a nonprofit institution of higher education offering bachelor of arts and bachelor of science degrees. The College is fully accredited by the North Central Association of Colleges and Secondary Schools. Its only relationship with any religious organization is that its bylaws provide that one-third of the members of its board of trustees be members of the religious order called The Sisters of the Third Order Regular of St. Francis of the Congregation of Our Lady of Lourdes, Rochester, Minnesota.

[12] The project to be refinanced at the College of St. Teresa consists of a library, service center, dormitory, and renovation of the dining hall kitchen.

The project to be refinanced at St. Mary's College consists of a college center building which houses a dining hall, snack bar, TV room,

The Authority further found the colleges to be nonsectarian; that students are admitted without discrimination; that enrolled students are not excluded, expelled, limited, or otherwise discriminated against because of race, color, creed, or national origin; that chapel attendance is not required; that they do not promulgate any distinctive religious doctrines, creeds, or tenets of any particular religious sect; that all courses of study, including courses in religion and theology are taught according to the requirements of the subject matter and the instructor's concept of professional standards. These findings were accepted as true by the parties.

Additionally, there was uncontroverted evidence presented at trial that the relationship of the colleges to religious organizations had no effect upon the secular content of their curriculum. In fact, the colleges all adhere to the *1940 Statement of Principles of Academic Freedom and Tenure* endorsed by the American Association of University Professors and the Association of American Colleges.

The only factor of record tending to indicate the colleges engaged in any religious activities is the presence of chapels on campus. The total annual expense of these religious activities at Bethel was $22,262, which is less than 1 percent of the total educational budget of that institution. St. Teresa expended $19,635 for on-campus religious activities, which is less than one-half of 1 percent of the total operating budget of that school. St. Mary's expended $16,100 for on-campus religious activities, which is less than one-half of 1 percent of that school's total operating budget.

The colleges submitted applications to the Authority for re-

---

lounge, post office, meeting rooms, music listening room, student government offices, barber shop, and campus store.

The project to be refinanced at Bethel College consists of an academic complex including a classroom center, fine arts center, learning resources center, and physical education center.

Defendant concedes the secular purpose of these projects.

financing of the projects which had been completed and financed privately. The Authority considered the applications, exhibits, and oral testimony and, thereafter, made the findings previously discussed. Additionally, the Authority found that refinancing the subject projects would:

(1) Enhance and preserve the college, the project, and utilization thereof for education purposes, and

(2) result in the extension and adjustment of the maturities of obligations incurred to construct the project to correspond to the resources available for their payment.[13]

The Authority thus approved the subject applications for refinancing under the Act and directed defendant, secretary of the Authority, to execute an agreement with each college whereby the Authority agrees to issue tax-exempt revenue bonds to refinance the indebtedness incurred by the colleges for construction of the projects. The Authority further directed defendant

---

[13] The Authority also made findings specifically applicable to the individual colleges as follows:

A. The refinancing at Bethel College would enhance and preserve educational programs and the acquisition and improvement of other facilities eligible to be projects under the Act. Specifically, the college expects to apply the interest cost savings to one or more of the following areas: (1) The purchase of biological and physical science equipment to satisfy the growing demand for preparation for health vocations, (2) library acquisitions and additional personnel to support the addition of a business major which will be made part of the curriculum beginning with the 1974-75 academic year, (3) construction of adequate facilities for a growing theater-drama program, and (4) purchase of equipment for use in the college's experimental psychology courses.

B. The refinancing at the College of St. Teresa would enhance and preserve educational programs and the acquisition and improvement of other facilities eligible to be projects under the Act.

C. The refinancing at St. Mary's College would eliminate the need for a special fee or higher tuition charges which would otherwise have to be imposed on students for use of the College Center and enhance and preserve educational programs and the improvement of other facilities eligible to be projects under the Act.

to publish the notices of bond sale pursuant to the agreements. Upon advice of the Authority's bond counsel that there was substantial doubt as to the constitutionality of the proposed bond issue, defendant refused to execute the agreements or to publish the notices.

The Authority brought an action for declaratory judgment in order to litigate the constitutional validity of the proposed bond issue, and, further, to compel defendant to follow the Authority's directive. The trial court found that the proposed refinancing programs did not violate either the Minnesota Constitution or the United States Constitution. Judgment was entered accordingly.

Defendant now appeals from the judgment and presents the following issues for consideration by this court:

(1) Does the issuance of tax-exempt revenue bonds by an agency of the State of Minnesota (under Minn. St. 136A.25 through 136A.53) in order to refinance indebtedness incurred by private religious affiliated colleges in the construction of facilities devoted exclusively to secular educational purposes constitute an expenditure of public funds in contravention of Minn. Const. art. 10, § 1, art. 11, §§ 2 and 5, and art. 1, § 16?

(2) Does the refinancing scheme violate Minn. Const. art 13, § 2?

(3) Does the refinancing scheme violate the establishment clause of the U. S. Const. Amend. I?

By way of introduction, we note that acts of the legislature are presumed to be constitutional and will not be declared unconstitutional unless their invalidity appears clearly or unless it is shown beyond a reasonable doubt that they violate some constitutional provision. City of Pipestone v. Madsen, 287 Minn. 357, 178 N. W. 2d 594 (1970); Minneapolis Gas Co. v. Zimmerman, 253 Minn. 164, 91 N. W. 2d 642 (1958). Statutes are to be construed so as to uphold their constitutionality. Minn. St. 645.17 (3); Port Authority of City of St. Paul v. Fisher, 275 Minn. 157, 145 N. W. 2d 560 (1966). The resolution of the issues presented

must be made in light of the presumption of constitutionality and the corresponding rule of construction.

■ Minn. St. 136A.35 provides:

"Bonds issued under authority of sections 136A.25 to 136A.42 do not, and shall state that they do not, represent or constitute a debt or pledge of the faith and credit of the state, grant to the owners or holders thereof any right to have the state levy any taxes or appropriate any funds for the payment of the principal thereof or interest thereon. Such bonds are payable and shall state that they are payable solely from the rentals, revenues, and other income, charges, and moneys as are pledged for their payment in accordance with the bond proceedings."

Minn. St. 136A.30 provides:

"All expenses incurred in carrying out the provisions of sections 136A.25 to 136A.42, shall be payable solely from funds provided under the authority of sections 136A.25 to 136A.42, and no liability shall be incurred by the authority hereunder beyond the extent to which moneys shall have been provided under the provisions of sections 136A.25 to 136A.42."

Despite these apparently clear and unequivocal legislative statements, defendant and the Minnesota Civil Liberties Union (MCLU) contend that the challenged statutory program necessarily involves the expenditure of "public funds."

Defendant's assertion is predicated upon a hypothesis that since the bonds are instruments of a public agency, then the proceeds must be public funds. Defendant also argues that the financial impact of the subject bonds places other potential borrowers at a disadvantage, as well as depriving the state treasury of tax income. Additionally, MCLU asserts that the *substance* of the bonding scheme is to free funds for other purposes. This economic benefit is therefore a use of public funds (citing Minnesota Civil Liberties Union v. State, 302 Minn. 216, 229, 224 N. W. 2d 344, 351 [1974]).

In the recent case of Minnesota Housing Finance Agency v. Hatfield, 297 Minn. 155, 210 N. W. 2d 298 (1973), this court considered a constitutional challenge to legislation which created the Minnesota Housing Finance Agency and which empowered that agency to issue tax-exempt bonds in order to provide loans to construct housing for families of low and moderate income. The legislation further provided that the bonds would not be a debt of the state.

One of the issues presented on appeal was whether the bonds were "debts" of the state. In disposing of that issue, this court stated:

"This issue can be easily disposed of since the debts created by MHFA, the Housing Development Bonds, are not 'payable directly, in whole or in part, from a tax of state-wide application' but solely from the revenues paid by the owners of the projects MHFA finances. The statute sets out detailed requirements for the establishment of bond and loan funds which are to be used to repay the loans and specifically states that the bonds are not debts or liabilities of the state." 297 Minn. 162, 210 N. W. 2d 303.

In Hunt v. McNair, 413 U. S. 734, 93 S. Ct. 2868, 37 L. ed. 2d 923 (1973), the Supreme Court had occasion to review the constitutionality under U. S. Const. Amend. I of South Carolina's statutory scheme of financing and refinancing of projects of institutions of higher education which was, in all relevant respects, *identical*[14] to the Act at issue in the instant case. With reference to the manner in which these institutions were aided, the court stated:

"The 'state aid' involved in this case is of a very special sort. We have here no expenditure of public funds, either by grant or loan, no reimbursement by a State for expenditures made by a parochial school or college, and no extending or committing

[14] This similarity between the South Carolina legislation and the subject act will be explored more fully in the discussion of issue No. 3, *infra*.

of a State's credit. Rather, the only state aid consists, not of financial assistance directly or indirectly which would implicate public funds or credit, but the creation of an instrumentality (the Authority) through which educational institutions may borrow funds on the basis of their own credit and the security of their own property upon more favorable interest terms than otherwise would be available. The Supreme Court of New Jersey characterized the assistance rendered an educational institution under an act generally similar to the South Carolina Act as merely being a 'governmental service.' Clayton v. Kervick, 56 NJ 523, 530-531, 267 A2d 503, 506-507 (1970). The South Carolina Supreme Court, in the opinion below, described the role of the State as that of a 'mere conduit.' 258 SC, at 107, 187 SE2d, at 650." 413 U. S. 745, note 7, 93 S. Ct. 2875, 37 L. ed. 2d 932.

In addition to the cases cited in the excerpt from McNair, other state appellate courts have examined legislative programs virtually identical to the Act at issue herein. In California Educational Facilities Auth. v. Priest, 12 Cal. 3d 593, 606, 116 Cal. Rptr. 361, 369, 526 P. 2d 513, 521 (1974), the California Supreme Court recognized that such a program did not impose a "financial burden" upon the state. In Opinion of the Justices, 354 Mass. 779, 236 N. E. 2d 523 (1968), the court was called upon to consider the constitutionality of a legislative program similar to the Act at issue in the instant appeal. One of the constitutional principles considered by the court mandated that "public money shall not be used except for a public purpose." 354 Mass. 785, 236 N. E. 2d 527. So far as is relevant to the issue at hand in the case at bar, the court stated that there was "no grant or appropriation of public money. 'Public money' is money raised by taxation." 354 Mass. 784, 236 N. E. 2d 527. The court further stated that there was no grant or appropriation of public money nor a loan of public credit.

There is language in Port Authority of City of St. Paul v. Fisher, 275 Minn. 157, 145 N. W. 2d 560 (1966), which favors

defendant's position in the issue at hand. In that case, the legislature had established a plan whereby the Port Authority of St. Paul could condemn "marginal" land along the Mississippi river bottom, construct industrial facilities thereon, and lease those facilities to private businesses. Minn. St. c. 458. However, Minn. St. 458.193, subd. 4, provided in part that revenue bonds issued by the port authority to finance the development of "marginal" lands *"shall be secured by the pledge of the full faith, credit and resources of the city of the first class in which said port authority has been created."* (Italics supplied.) When Minn. St. 136A.30 and 136A.35 are compared to this provision, Port Authority of City of St. Paul v. Fisher, *supra*, is clearly distinguishable.

MCLU urges that Minnesota Civil Liberties Union v. State, 302 Minn. 216, 224 N. W. 2d 344 (1974), is relevant to the issue of what constitutes "public money." However, that opinion did not address itself to that question and, thus, its relevancy to the issue at hand is minimal at best.

In summation, we hold that the scheme of financing and refinancing is not an expenditure of "public money" in violation of Minn. Const. art. 10, § 1, art. 11, §§ 2 and 5, and art. 1, § 16. Therefore, these constitutional provisions do not apply in the instant case.

■ We next consider defendant's challenge to the constitutionality of the Act which is predicated upon Minn. Const. art. 13, § 2, which provides as follows:

"In no case shall any public money or property be appropriated or used for the support of schools wherein the distinctive doctrines, creeds or tenets of any particular Christian or other religious sect are promulgated or taught."

We believe that this portion of our constitution does not prohibit the financing scheme at issue for two reasons. First, this provision speaks in terms of "public money." Since we have held that public money is not involved in this case, art. 13, § 2, does

108

not apply. Secondly, it is our belief that the uncontroverted facts of record clearly establish that the proposed refinancing does not provide funds that will be used for the support of schools where distinctive religious doctrines, creeds, or tenets are taught. As will be discussed more fully, the colleges are secular in nature and there is absolutely no evidence to compel this court to conclude that the benefits from the Act will support the promulgation of religious beliefs.[15]

■ Defendant's final challenge to the validity of the Act is based on the Establishment Clause of the U. S. Const. Amend. I.

In Lemon v. Kurtzman, 403 U. S. 602, 612, 91 S. Ct. 2105, 2111, 29 L. ed. 2d 745, 755 (1971), the Supreme Court used the following principles to govern judicial consideration of challenges to statutes as violative of the Establishment Clause of the U. S. Const. Amend. I:

"* * * First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither enhances or inhibits religion, * * * finally, the statute must not foster 'an excessive government entanglement with religion.' "

The Supreme Court has recognized that these principles are "no more than helpful signposts." Hunt v. McNair, 413 U. S. 734, 741, 93 S. Ct. 2868, 2873, 37 L. ed. 2d 923, 930.

### PURPOSE

Defendant concedes that the Act is secular in purpose. Indeed, a review of Minn. St. 136A.27 and the uncontroverted facts discloses that the Act is unquestionably secular in purpose.

### EFFECT

In Hunt v. McNair, *supra*, the Supreme Court upheld the validity of legislation enacted in South Carolina which we cannot

---

[15] It has been argued that Minn. Const. art. 13, § 2, applies only to elementary and secondary schools. Since it is not necessary to today's decision, we offer no opinion as to that contention.

distinguish from the Act herein challenged. Defendant has recognized this similarity and concedes that if the Authority was proposing to issue bonds to finance *new* construction, there would be no violation of the "effect" test set forth in Lemon v. Kurtzman, *supra,* as applied by the Court in Hunt v. McNair, *supra.*

Defendant seeks to distinguish the instant case from Hunt v. McNair, *supra,* on grounds that in the former the interest-cost savings derived by the colleges may be applied to finance on-campus religious activities. We do not agree that the distinction may be drawn. Whether a private college employs the Act to obtain financing or refinancing, interest-cost savings are realized. The Supreme Court in Hunt has laid this interest-cost savings argument to rest as follows:

"* * * [T]he Court has not accepted the recurrent argument that all aid is forbidden because aid to one aspect of an institution frees it to spend its other resources on religious ends." 413 U. S. 743, 93 S. Ct. 2874, 37 L. ed. 2d 931.[16]

Moreover, the record before us does not contain one scintilla of evidence that the interest-cost savings would be employed to support religious activities. Rather, the record indicates that the colleges will spend any such funds for solely secular educational purposes. Defendant has the heavy burden to establish that the Act would be employed for unconstitutional purposes, a burden which clearly has not been sustained in this case.

In Tilton v. Richardson, 403 U. S. 672, 685, 91 S. Ct. 2091, 2099, 29 L. ed. 2d 790, 803 (1971), the Supreme Court recognized that—

"[t]here are generally significant differences between the religious aspects of church-related institutions of higher learning and parochial elementary and secondary schools. The 'affirma-

[16] See, also, Bradfield v. Roberts, 175 U. S. 291, 20 S. Ct. 121, 44 L. ed. 168 (1899); Walz v. Tax Commission, 397 U. S. 664, 90 S. Ct. 1409, 25 L. ed. 2d 697 (1970); Tilton v. Richardson, 403 U. S. 672, 91 S. Ct. 2091, 29 L. ed. 2d 790 (1971).

tive if not dominant policy' of the instruction in pre-college church schools is 'to assure future adherents to a particular faith by having control of their total education at an early age.' *Walz v. Tax Comm'n, supra,* at 671. There is substance to the contention that college students are less impressionable and less susceptible to religious indoctrination. Common observation would seem to support that view, and Congress may well have entertained it. The skepticism of the college student is not an inconsiderable barrier to any attempt or tendency to subvert the congressional objectives and limitations. Furthermore, by their very nature, college and postgraduate courses tend to limit the opportunities for sectarian influence by virtue of their own internal disciplines. Many church-related colleges and universities are characterized by a high degree of academic freedom and seek to evoke free and critical responses from their students."

This distinction is not irrelevant when considering defendant's attempts to employ Minnesota Civil Liberties Union v. State, *supra*; Committee of Public Education v. Nyquist, 413 U. S. 756, 93 S. Ct. 2955, 37 L. ed. 2d 948 (1973) ; and Lemon v. Kurtzman, *supra*.

We cannot avoid adding that aid to higher education is in an entirely different category than aid to primary and secondary schools. The long established and traditional Federal aid to returning servicemen (commonly known as the G. I. Bill of Rights), of aid to college based research, and aid for the construction of facilities are notable examples.

In summation, we hold that the *effect* of the proposed refinancing scheme does not violate the U. S. Const. Amend. I.

## ENTANGLEMENT

We mention this issue only in passing as defendant has conceded that no unconstitutional entanglement is present in this case. Indeed, Hunt v. McNair, *supra,* is conclusive on the issue of entanglement.

The judgment of the trial court is, therefore, affirmed.

MR. JUSTICE OTIS and MR. JUSTICE PETERSON took no part in the consideration or decision of this case.