JOHN SORENSON v. CARGILL, INCORPORATED, AND ANOTHER.

163 N. W. (2d) 59.

October 11, 1968—No. 40,485.

*Murnane, Murnane, Battis & deLambert, E. Willard Murnane, Lord, Bissell & Brook,* and *William H. Hillier,* for appellants.

*Robins, Davis & Lyons, Solly Robins, John F. Eisberg,* and *William B. Stukas,* for respondent.

FRANK T. GALLAGHER, JUSTICE.

This is an appeal by defendants from an order of the district court denying their motion for a new trial or for amended findings of fact, conclusions of law, and order for judgment.

The case arose out of injuries suffered by plaintiff, John Sorenson, who was 42 years old at the time of the accident. He was then president

and principal officer of, and employed by, S & T Corporation (hereinafter S & T), a Nebraska general contractor whose primary activity was demolishing buildings and hauling dirt in the Omaha area. Defendant Cargo Carriers, Incorporated (Cargo Carriers) is engaged in the operation of barges on inland waterways of the United States and is a subsidiary of defendant Cargill, Incorporated (Cargill).[1]

Plaintiff was injured on May 1, 1963, when he fell between hatch covers 2 and 3 on defendants' barge M-30 while it was docked at the Marine Leasing pier in Omaha, Nebraska. The injury occurred at night during an unloading operation when the area was well lighted, specifically for the purpose of night work. The unloading was being performed by the stevedoring contractor, White Excavating, and its subcontractor, S & T, whose function was to do the trucking of the bulk salt after it was unloaded from the barge. Gerald White of White Excavating was supervising the unloading.[2]

Barge M-30 was 195 feet long and 35 feet wide. It was covered by eight movable rolling hatch covers, each of which had an estimated weight of between 10,000 and 12,000 pounds. Hatch covers 2 and 3 and 6 and 7 are "high" covers which slide over the others. Covers 2 and 3, 4 and 5, and 6 and 7 abut one another and are sealed or locked by locking devices.

---

[1] Marine Leasing Services, Incorporated (Marine Leasing) is the owner of a dock facility at Mile 612.2, Missouri River, Omaha, Nebraska. White Excavating Company (White Excavating) is a sole proprietorship owned by Gerald White and is engaged in the general contracting business, mostly moving dirt and wrecking buildings in the Omaha area.

[2] Defendants claim that the arrangements between S & T and White Excavating concerned only the hauling of salt; that according to White the agreement was entered into because S & T had trucks available while White did not; and that the contract between White and Cargill for hauling salt was entirely separate from the contract between Cargo Carriers and Marine Leasing and also from the contract between Marine Leasing and White Excavating for unloading the barges, and the fact that plaintiff may have chosen from time to time to help White does not change the basic effect of their agreement. We cannot see, however, where these claims by defendants have any determinative bearing on the question here as to whether the vessel was seaworthy or the damages were excessive.

Covers 8 and 1 lock to the barge combing at each end and contact the covers on their other side, 7 and 2 respectively, by an overlapping edge rather than a locking device. The covers roll on wheels on steel rails. The locking device between covers 2 and 3 consists of a tongue one-half inch thick and 4 inches wide. The operative part of the lock hooks 30 degrees and is approximately 10 inches long. The hook is attached to a handle by a bolt. The handle's end is attached to the angle iron of one of the covers, and the hook of the lock is attached to the handle nearer the middle of the handle. The lock is thus similar to that on a piece of luggage. The hook is placed over the angle iron of the abutting hatch cover, and the handle is then depressed in such a manner that when the handle makes contact with the hatch cover itself, the tension created exerts pressure downward on the handle toward the cover.

The injury here occurred during the attempt to complete the closing of these covers. All of the salt had been removed and all of the covers positioned with the exception of cover 1, which would not close by the usual method of pushing and prying. White Excavating therefore resorted to the use of the crane. Defendants agree that it is normal for such covers to become stuck because of warping, wear and tear, dirt, etc., and the parties agree that the use of the crane in closing covers is a normal practice. Thus, White attached a cable to cover 1, ran it through a pulley, and attached it to the crane so that the crane could exert a force on the cover which force would be parallel to the rails on which the covers ran. Early attempts to close cover 1 with the crane alone did not work because a parallel force was not being exerted.

At the time this system was being rigged, plaintiff was sweeping the excess salt from the tops of the barge covers. As he finished, he was instructed by White to stand "aft" (back) of the pulley and sight down the cable to ensure that it remained in line during the procedure. Following White's direction, plaintiff stationed himself on cover 2. White then signalled the crane operator to put pressure on the cable. At first the cover did not move. White instructed the operator to tap his brake so as to give the cable a jerking motion. This was done, and the cover moved slightly and then quickly. As cover 1 approached the barge end combing but before it made contact with the combing, cover 2 separated from

cover 3. Plaintiff, who was standing on cover 2, was thrown off balance by the forward motion and fell backward through the gap which opened between the two covers. He came to rest on the floor of the barge 12 to 14 feet below.

At the time of the accident, covers 2 and 3 were secured together. Plaintiff claims that he is entitled to recover for his injuries because of the unseaworthy condition of the vessel. This condition was in turn allegedly caused by the defective condition of the locking devices between covers 2 and 3. The trial court found that the vessel was unseaworthy and that the unseaworthiness was caused solely by the defective condition of the locking devices. The court did not find that the stevedoring contractor, White, had acted negligently so as to contribute to the unseaworthiness.

The court also found that, as a result of his injuries, plaintiff was hospitalized initially from May 1, 1963, to August 14, 1963, and was attended by around-the-clock special nurses up to the last days of his hospitalization; that he was rehospitalized on three subsequent occasions because he needed surgery for injuries arising out of the accident; and that he was attended by, and was continued to be observed by, a number of medical specialists because of his injuries and present condition. The findings explained the extent and nature of plaintiff's injuries, which findings we will not detail here except to say that plaintiff has been totally incapacitated from remunerative employment and the evidence establishes that he has been permanently and totally disabled.

The court further found that plaintiff incurred and expended for hospital, medical, and nursing care to the time of trial the sum of $24,468.80 and suffered a loss in wages of $22,800; and that, based on his projected earnings, he will suffer future wage losses of $244,453, reduced by a 3-percent commutation to present worth of $159,583. Also, that his pain and suffering since the accident have been very great and will be very great in the future; that his injuries include loss of hearing, lack of balance, loss of sexual potency, and brain damage; and that $300,000 would be reasonable and just for his permanent disability, pain and suffering, and mental anguish.

The court concluded that the defective condition of the cover locking devices on barge M-30 rendered the vessel unseaworthy at the time of

plaintiff's injuries; that the unseaworthiness of the barge was the proximate cause of his injuries; that he was not contributorily negligent; and that he should have judgment against defendants in the amount of $500,000.

Thereafter, defendants moved for amended findings, conclusions, and order for judgment, or for a new trial, which motion was denied June 22, 1966, and judgment was ordered on the original findings, conclusions, and order for judgment.

In a memorandum in connection with its order, the trial court stated that after carefully reviewing the testimony and evidence, and after much study and consideration of the case, it could only come to the same findings, conclusions, and order for judgment filed April 29, 1966; that the evidence established that plaintiff was clearly entitled to recover damages from defendants for the personal injuries he sustained in the accident; and that plaintiff was transformed from an active, ambitious person into a dependent, disabled individual. The court said that the amount of damages appeared to be well within the reasonable area of plaintiff's loss, considering his expenses, future prospects of further medical care, examinations and attention, and the serious reduction of his prospects for future enjoyment of life; and that the combination of his injuries more than justified the court's conclusion as to the amount of his damages.

The principal questions, in our opinion, for determination on appeal are: (1) Was there adequate evidence to support the court's finding that the vessel was unseaworthy? (2) Were the damages awarded excessive?

■ Defendants argue that the finding that the barge was unseaworthy was erroneous because: (a) An owner of a vessel is not an insurer but is only required to furnish a vessel reasonably fit for her intended service; (b) the court made no finding on the intended purpose of the locking devices; (c) the only finding which the evidence could support is that the locking devices were intended only to hold the hatch covers together so as to protect the cargo from weather during a normal voyage, which they did; and (d) the allegedly negligent actions of the stevedoring contractor in failing to properly position the hatch covers on barge M-30 and in subjecting the locking devices between covers 2 and 3 to forces put into play by the crane constituted an intervening cause not foreseeable by

the shipowner and could not by themselves make the vessel unseaworthy. Defendants urge that there is no competent evidence to support a verdict based on the unseaworthiness of the vessel.

The doctrine of unseaworthiness imposes upon the shipowner the absolute obligation to provide a ship, equipment, and crew which are reasonably fit for their intended service. Mitchell v. Trawler Racer, Inc. 362 U. S. 539, 80 S. Ct. 926, 4 L. ed. (2d) 941; Boudoin v. Lykes Brothers SS. Co. 348 U. S. 336, 75 S. Ct. 382, 99 L. ed. 354. Both parties agree that this is the applicable rule. The only disagreement is over the intended purpose of the locking devices. Plaintiff claims that the intended purpose of the devices was to hold the hatch covers together whenever this was necessary for loading, transporting, or unloading the cargo. Defendants argue, however, that their only intended purpose was to hold the hatch covers together so as to protect the cargo from the weather during the course of an ordinary voyage on the river.

It appears to us that the plain meaning of the findings of the trial court was that the purpose of the locking devices was to secure the hatch covers during the course of any operation customarily engaged in while handling the covers. In this case seven of the eight hatch covers were closed and locked together. Evidently, however, they were not properly aligned, since, when cover 1 was pulled shut by the crane, its overlapping edge struck the overlapping edge of cover 2 exerting force on the locking devices between covers 2 and 3 which failed to hold. Since it is undisputed that it was customary to close the covers through the use of the crane and cable mechanism, and since it is clear from the testimony that this type of contact between covers 1 and 2 during the course of this customary closing procedure was not unusual, there can be no question but that the locking devices failed to accomplish their intended purpose, thereby rendering the barge unseaworthy. Thus, we must conclude that defendants' claims that the locking devices were not being used for their intended purpose and that the trial court failed to make findings as to their intended purpose are without merit.

Under relevant maritime law, the finding of the trial court that barge M-30 was in an unseaworthy condition at the time of the accident is supported by the evidence. In passing on the evidence sustaining the finding

of unseaworthiness of the vessel or barge, we do not consider it necessary to discuss in detail the correctness of the finding, since it is not incumbent upon an appellate court to do so. Knutson v. Lasher, 219 Minn. 594, 18 N. W. (2d) 688.

Defendants argue that the stevedoring contractor was guilty of intervening negligence, which was the actual proximate cause of plaintiff's injury, in failing to properly position the other hatch covers before exerting force on cover 1. Whether White Excavating was thus negligent or not is irrelevant in a suit against the owners of the barge, it having been found that the barge was unseaworthy.

There is no dispute that if the trial court's finding on the question of unseaworthiness is sustainable, defendants are liable. Since we hold these findings to be adequate, we must affirm the order and judgment of the trial court.

Defendants urge us, however, to remand the case for more complete findings on the question of intended use and the asserted negligence of the stevedoring contractor. We see no sound reason for such action since our affirmance merely implies that we cannot say that the stevedoring contractor was negligent as a matter of law. The trial court made no finding that the stevedoring contractor was not negligent, and we do not foresee that our affirmance will have any res judicata effect upon any subsequent attempt by defendants to obtain contribution in a proper forum from White Excavating.

■ The next issue which raises a problem is the amount of damages awarded plaintiff, $500,000. The trial court allowed all of the provable damages—$24,468.80 for hospital, medical, and nursing care; $22,800 for loss of wages from May 1, 1963, the date of the accident, up to the time of trial in March 1966; $244,453, discounted by 3 percent to present worth of $159,583, for loss of future earnings; and $300,000 for pain and suffering.

The first two items, totaling $47,268.80 for hospital, medical, and nursing care and loss of wages from the time of the accident to the time of trial, are clearly reasonable. The third item, discounted to present value of $159,583, appears to be based solely on the testimony of Thomas Pennington, an actuary, who testified that this sum invested at 3 percent

would provide payments of $150 per week for plaintiff's statistical life expectancy of 31.34 years. The fourth item of $300,000 for pain and suffering seems to be an arbitrary figure, arrived at by the court on a basis not in conformity with some of our decisions prior to the trial of this case in which questions of excessive damages were raised.

Defendants cite several Minnesota cases for the assertion that the damages as a whole are excessive, including Hallada v. G. N. Ry. Co. 244 Minn. 81, 69 N. W. (2d) 673; McCrank v. G. N. Ry. Co. 260 Minn. 329, 109 N. W. (2d) 582; Ahlstrom v. Minneapolis, St. P. & S. S. M. Ry. Co. 244 Minn. 1, 68 N. W. (2d) 873; and Thill v. Modern Erecting Co. 272 Minn. 217, 136 N. W. (2d) 677.

In Hallada v. G. N. Ry. Co. *supra,* plaintiff, a brakeman employed by defendant railway company, suffered amputation of the right arm and a concussion fracture of the eighth thoracic vertebra, which caused muscle spasm in the lower thoracic and upper lumbar region. He received a jury verdict of $170,154.81. This court granted a new trial unless a remittitur of $105,000 was accepted by plaintiff. We said in that case that the reasonableness of an award for damages can be appraised only in the light of the elementary principle that plaintiff should be given neither more nor less than a sum which leaves him financially whole to the same extent that he would have been had no injury occurred, and that whether an injured person has been made financially whole must be tested by determining what the total amount of damages awarded by the court or jury will accomplish for the injured person if conserved and used with ordinary prudence. We pointed out that in order to ascertain the damages for impaired earning capacity, it is necessary to determine the life expectancy of the individual at the time of the tort. For this purpose, we stated, mortality tables based on the average life of a large group of persons have considerable evidentiary value, but they are neither decisive of the injured person's life expectancy nor of the number of years his earning capacity would have continued undiminished if he had not been injured, for there is no assurance that a person's future earnings will continue uninterrupted and unimpaired for his full life expectancy. We said that mortality tables are but one of several evidentiary factors to be weighed in ascertaining life expectancy as a preliminary step to the determination

of earning expectancy, and that life expectancy and earning expectancy are not synonymous since a person may live longer than he is capable of pursuing gainful employment. We held that in determining either of these expectancies, the finder of fact is not permitted to simplify the task by accepting the mortality tables as an unerring guide because the injured plaintiff's physical condition and health as an individual must also be appraised.

It is apparent in this case that the trial court's award for loss of future earnings was made solely on the basis of one mathematical formula using a figure of life expectancy taken from a mortality table. The trial court evidently failed to consider the many other possible factors involved. Reliance upon a mathematical formula without testing the reasonableness of the award in the light of its overall effect is not permissible. McCrank v. G. N. Ry. Co. *supra.*

In McCrank, a case quite similar to the situation here, the plaintiff, a 51-year-old employee of the defendant railroad company, suffered a severed spinal cord at the juncture of the seventh cervical and first dorsal vertebrae, causing complete loss of motor function, control, and sensation below that area. Medical testimony estimated the disability to be 75 to 100 percent. The injury also affected the use of his hands, and he was described by this court as a quadriplegic. The jury returned a verdict of $500,000. Defendant appealed from an order denying its alternative motion for judgment notwithstanding the verdict or for a new trial. The order appealed from was reversed in this court and a new trial granted unless plaintiff within 10 days filed a written consent that the verdict be reduced to $325,000, and in that event the order was affirmed. The court, in declaring the damages excessive, stated that the verdict must stand the test of reasonableness in the light of its overall effect and must not be based solely on a mathematical formula without testing the reasonableness of the award. Quoting from Hallada we said (260 Minn. 333, 109 N. W. [2d] 585):

"* * * No recognized theory of damages or principle of common sense requires that plaintiff, *over and beyond his damages,* be endowed with an estate at the conclusion of his life expectancy."

In Ahlstrom v. Minneapolis, St. P. & S. S. M. Ry. Co. *supra,* involving a paraplegic 21 years of age and a jury verdict of $275,000, we reversed and granted a new trial unless plaintiff consented to a reduction of the verdict to $175,000. We concluded that the damages assessed by the jury were clearly excessive; that it was an abuse of the trial court's discretion to allow the jury's verdict to stand; and that the excessive verdict resulted merely from the jury's unwitting acceptance of the figures submitted by plaintiff[3] with respect to the elements of damage without appreciating that they were predicated upon an inadequate or improper factual foundation in each instance.

In Thill v. Modern Erecting Co. *supra,* the jury awarded damages of $642,400 where plaintiff had suffered a broken spinal cord at the midchest level and had no sensation or control over his bodily functions below that level. The trial court found that any amount above $375,000 was excessive and granted defendant's motions for a new trial unless plaintiff accepted a reduction of the verdict to $375,000. Plaintiff filed a written acceptance, but he sought on appeal to this court to have the verdict reinstated. This court agreed with the trial court that the jury reached an excessive verdict by logical application of mathematical formulas which swelled the total sum beyond a reasonable figure. We held in that case that the $375,000 set by the trial court should be upheld.

There seems to be no specific formula used in this case to calculate the court's award of $300,000 for pain and suffering, disability, and mental anguish. The $244,453, discounted at 3 percent to present value of $159,583, for loss of future wages appears to have been determined on the testimony of an actuary. It is our opinion that those two amounts resulted in part from a reliance upon a mathematical formula for future wages and an arbitrary figure for pain and suffering and have been granted as a whole without testing the reasonableness of the award in the light

---

[3] The figures submitted by plaintiff were: Loss of wages to time of trial, $13,747.57; medical expenses at hospital, $9,356.50; nursing at home by parents, $9,300; cost of daily attendant in the future, $86,347.98; loss of future earning capacity, $85,167; pain and suffering and disability— past and future, $91,670; total, $295,589.05.

of its overall effect, contrary to our rules set out above, and that they are therefore excessive.

We recognize that if the above two items totaling $459,583 were permitted to stand, the part plaintiff would receive would be reduced by certain costs, expenses, and attorneys' fees. However, even after those deductions plaintiff might receive a net of $300,000 (not counting the proven damages), and if that amount were prudently invested at a rate of 5 percent, which is currently available in many places, he could receive $15,000 a year for his 31.34 years of life expectancy—the period which the trial court and actuary apparently considered in arriving at those figures—and his estate could still have $300,000 in cash at the end of that expectancy. This would not be in conformity with what we said in Hallada v. G. N. Ry. Co. *supra*, to the effect that a plaintiff, in excess of his damages, should not be endowed with an estate at the conclusion of his life expectancy.

We have considered other issues raised by defendants, but it is our opinion that the ones passed on here are sufficient to determine the merits of this appeal.

We therefore hold that the order appealed from is reversed and a new trial is granted unless within 10 days after the filing of this opinion the plaintiff shall file in this court a written consent that the verdict be reduced to the sum of $350,000. In the event that such consent be filed within the time stated, the order shall be affirmed.

Where a new trial is granted unless the plaintiff consents to a reduction in the amount of the verdict to a specific amount, and the plaintiff so consents, he is entitled to interest on the amount of the verdict as reduced from the time the verdict was originally rendered unless the mandate of the appellate court clearly excludes such interest. We recognize the discretionary power of this court to allow or disallow interest on a verdict as reduced, but we see no reason in this case to deny plaintiff his interest on the reduced amount from the time the original verdict was entered. Hallada v. G. N. Ry. Co. 244 Minn. 81, 100, 69 N. W. (2d) 673, 688, and cases cited.

Where an order or judgment from which an appeal is taken is in all respects affirmed on the merits on condition that the respondent con-

sent to a remittitur, and the respondent files such consent, the respondent is the prevailing party and he is entitled to tax his disbursements. No statutory costs will be allowed. Bierlein v. Gagnon, 255 Minn. 143, 152, 96 N. W. (2d) 573, 580.

Reversed on condition.