Eugene SHERLOCK, et al., Respondents,

v.

STILLWATER CLINIC, a Partnership Composed of Jon R. Stratte, J. E. Jensen, M. F. Juergens, Neil M. Bealka, Thomas Murphy, R. Powell and P. M. Spilseth, Appellants.

No. 46347.

Supreme Court of Minnesota.

Oct. 14, 1977.

Rehearing Denied Dec. 13, 1977.

Altman, Geraghty, Mulally & Weiss and James W. Kenney, St. Paul, for appellants.

Robins, Davis & Lyons and John F. Eisberg and Paul L. Gingras, St. Paul, for respondents.

ROGOSHESKE, Justice.

The principal question raised on this appeal is whether and to what extent compensable damages may be recovered for the birth of a normal, healthy child proximately caused by a negligently performed sterilization operation. We hold that in cases such as this an action for "wrongful conception" may be maintained, and that compensatory damages may be recovered by the parents of the unplanned child. These damages may include all prenatal and postnatal medical expenses, the mother's pain and suffering during pregnancy and delivery, and loss of consortium. Additionally, the parents may recover the reasonable costs of

rearing the unplanned child subject to off-setting the value of the child's aid, comfort, and society during the parents' life expectancy. Because of errors in the submission of the issue of damages to the jury in this case, we remand for a new trial limited to that issue.

Following the birth of their seventh child in August 1970, Mr. and Mrs. Eugene Sherlock consulted Dr. Jon Stratte, a member of the Stillwater Clinic, and discussed with him the various medical alternatives available to them to ensure that their family would grow no larger. A decision was reached that Mr. Sherlock would undergo a vasectomy, which operation was subsequently performed by Dr. Stratte at the clinic on December 11, 1970. The Sherlocks were advised at the time of the operation that they should either refrain from sexual relations or take additional contraceptive measures until it was conclusively determined by postoperative testing that Mr. Sherlock's semen was free of sperm.

On January 23, 1971, Mr. Sherlock brought a sample of his semen to the Stillwater Clinic for testing. Later that same day, Dr. Stratte telephoned Mr. Sherlock and informed him that the results of the test were "negative." Mr. Sherlock further testified that Dr. Stratte did not advise him to return for additional testing, nor was there any discussion concerning the need for the continued use of contraceptives. In fact, the January 23 test revealed that Mr. Sherlock's semen had a sperm density of 5 to 10 sperm cells per high-powered microscope field and that 50 percent of these were motile. Although Dr. Stratte testified to having no recollection of the telephone conversation with Mr. Sherlock, he was permitted to testify that, based upon his usual habit, he would have told Mr. Sherlock that the presence of live sperm cells meant that he was not yet sterile, and that he should bring a second sample in 2 to 3 weeks.

Relying on the erroneous belief that the operation had been successful, the Sherlocks resumed normal sexual relations without contraceptives. To their consternation, Mrs. Sherlock began to miss her menstrual periods several months later. On August 5, 1971, Mr. Sherlock returned to the clinic for a second test, and this time he was correctly advised that the vasectomy had been ineffective. The following day, it was determined that Mrs. Sherlock was pregnant, and in due course she delivered a healthy baby boy on March 6, 1972.

The Sherlocks thereafter brought suit against defendants, claiming that their eighth child's unplanned birth was a direct result of Dr. Stratte's negligent postoperative care of Mr. Sherlock.[1] Damages were sought for medical expenses incident to the birth, in addition to the pain and suffering caused to Mrs. Sherlock during her pregnancy and delivery, Mr. Sherlock's loss of consortium, and the costs of supporting and educating the child until the age of majority. Despite the perplexing and developing nature of the law relating to damages in cases of this type, the lawsuit was tried as an ordinary medical negligence action and submitted to the jury upon general negligence instructions. The jury returned a general verdict for $19,500, and defendants' post-trial motions for a new trial or judgment notwithstanding the verdict were denied. Defendants now challenge this award, principally on the grounds that the evidence was insufficient to support the

---

1. To a lesser extent, the Sherlocks also alleged that the vasectomy itself had been negligently performed. There are significant problems of proof when a plaintiff tries to establish that the operation itself was negligently performed. The first and most obvious difficulty is that the area operated upon is fully concealed. Moreover, in a small percentage of cases the operation will be unsuccessful even though the physician exercised the highest degree of care. This is because the vas deferens, which is severed during a vasectomy operation, has a natural tendency to grow back together again, or recanalize. Because of the possibility of recanalization, most plaintiffs in malpractice actions do not attempt to prove that the vasectomy was negligently performed but instead allege negligent postoperative care. See, Lombard, *Vasectomy*, 10 Suffolk U.L.Rev. 25; Note, 56 Geo.L.J. 976.

verdict and that the verdict was contrary to law.[2]

In reviewing the sufficiency of the evidence to support a jury verdict, it is fundamental that we may not substitute our judgment on disputed questions of fact. This position was succinctly set forth in *Gibeau v. Mayo*, 280 Minn. 170, 175, 158 N.W.2d 589, 592 (1968):

"* * * Where the resolution of a disputed fact issue turns largely upon an assessment of the relative credibility of witnesses whose testimonial demeanor was observed only by the jury and the trial court and the latter has approved the finding made, we are obliged to affirm even though we might have reached a contrary finding."

See, also, *Hestad v. Pennsylvania Life Ins. Co.*, 295 Minn. 306, 204 N.W.2d 433 (1973). Given this stringent standard of review, we hold that the jury could justifiably have concluded that Dr. Stratte negligently informed Mr. Sherlock that his test results were negative, and that the unwanted conception and subsequent birth of the Sherlocks' eighth child were a direct result of this negligence.

Prior to 1967, few courts had considered the question of whether the parents of an unplanned child could maintain an action against a physician for an improperly performed sterilization operation and, if so, the extent to which the compensatory damages were recoverable. The first of what were later to become known as the "wrongful birth"[3] cases was decided by this court in *Christensen v. Thornby*, 192 Minn. 123, 255 N.W. 620, 93 A.L.R. 570 (1934). In that case the plaintiff had undergone a vasectomy after his wife had experienced great difficulty in giving birth to her first child. When his wife subsequently became pregnant and delivered her second child, the plaintiff brought suit for his "anxiety and expenses" incident to the birth, claiming that the physician who had performed the vasectomy had deceived him into believing that the operation had been successful. The trial court sustained a demurrer to the complaint, and on appeal we affirmed on the ground that the plaintiff had failed to allege that the false representation was made with fraudulent intent sufficient to support his allegation of deceit. Apart from the technical disposition made in this case, we expressly held that sterilizations were not contrary to public policy and that an action, if properly pleaded, could be maintained against a physician for the improper performance of such an operation.[4]

Viewed in its correct posture, the *Christensen* case stands solely for the proposition that a cause of action exists for an improperly performed sterilization. The more

---

**2.** Defendants also claim that the Sherlocks failed to establish by expert testimony the applicable standard of care for physicians who perform sterilization operations, and that the trial court erred in admitting various hospital records of Mrs. Sherlock. We have carefully reviewed these issues and find them to be without merit.

**3.** An action brought by parents for "wrongful birth" is frequently confused with an action for "wrongful life," which is brought by a child to recover damages for wrongfully being born. The leading "wrongful life" case is *Zepeda v. Zepeda*, 41 Ill.App.2d 240, 190 N.E.2d 849 (1963), certiorari denied, 379 U.S. 945, 85 S.Ct. 444, 13 L.Ed.2d 545 (1964), where a child sued his father for allowing him to be born illegitimate. Neither the Illinois court nor any other court has been willing to permit damages in this type of action, largely because it is impossible for the trier of fact to measure damages by placing the child in the position he would have been in had he not been born. See, also, *Gleitman v. Cosgrove*, 49 N.J. 22, 227 A.2d 689, 22 A.L.R.3d 1411 (1967); *Slawek v. Stroh*, 62 Wis.2d 295, 215 N.W.2d 9 (1974); Annotation, 22 A.L.R.3d 1441.

**4.** This cause of action was more recently recognized implicitly in *Martineau v. Nelson*, Minn., 247 N.W.2d 409 (1976), where we reviewed the sufficiency of the evidence to support a jury finding that the parents of an unplanned child were barred from recovery because of contributory negligence. Although this case was concerned solely with evidentiary considerations, we would not have resolved these questions had we disapproved of the underlying cause of action for medical negligence. However, in deciding the *Martineau* case, we specifically declined to pass on the issue raised on this appeal dealing with the measure of damages caused by a negligently performed sterilization. See, Minn., note 18, 247 N.W.2d 417.

troublesome question of damages once liability on the part of a physician is established was neither raised nor directly considered. Nevertheless, the following dicta from the *Christensen* opinion was later relied on by other courts to preclude parents from recovering damages for the economic costs of an unplanned child (192 Minn. 126, 255 N.W. 622, 93 A.L.R. 572):

"* * * [T]he plaintiff has been blessed with the fatherhood of another child. The expenses alleged are incident to the bearing of a child, and their avoidance is remote from the avowed purpose of the operation. As well might the plaintiff charge defendant with the cost of nurture and education of the child during its minority."

In the years which followed the *Christensen* case, courts and commentators developed several theories to support the view that, as a matter of public policy, parents should not be permitted to recover damages for the birth of a healthy child, even though the infant may have been unplanned or unwanted at the time of conception. Perhaps the most fundamental argument was that the allowance of damages would be antithetical to the historically conceived purpose of marriage. As expressed by the court in *Shaheen v. Knight*, 6 Lyc. 19, 23, 11 Pa.D. & C.2d 41, 45 (1957):

"* * * The great end of matrimony is not the comfort and convenience of the immediate parties, though these are necessarily embarked in it; but the procreation of a progeny having a legal title to maintenance by the father * * *."

Equally disturbing to the court in the *Shaheen* case, where the only damages asked were the expenses of rearing the child, was the injustice of requiring a negligent physician to pay for all the economic costs of an unplanned child while the parents derived all the joy, affection, and satisfaction from rearing the child. It was also argued that an action for damages should not be countenanced since it would have the effect of reducing the child to an "emotional bastard" when he inevitably learned that his birth was attributable to a doctor's negligence and not his parents' desires. Finally, a number of courts took the position that any damage caused to the parents was more than offset by the intangible benefits gained by the birth of a child. See, *Gleitman v. Cosgrove*, 49 N.J. 22, 227 A.2d 689, 22 A.L.R.3d 1411 (1967); *Ball v. Mudge*, 64 Wash.2d 247, 391 P.2d 201 (1964); Annotation, 22 A.L.R.3d 1441. In summary, although most courts recognized that the unwanted birth caused both physical and financial injury to the parents, recovery was denied because of the potential emotional injury to the child, repugnance to social ethics with respect to the family establishment, and the position that the incidental parental burdens were outweighed by the benefits. See, Comment, 9 Utah L.Rev. 808.

The first case to expressly reject these policy arguments and to hold that the parents of an unplanned normal child could recover all damages proximately caused by a negligently performed sterilization operation was *Custodio v. Bauer*, 251 Cal.App.2d 303, 59 Cal.Rptr. 463, 27 A.L.R.3d 884 (1967). There the court allowed as damages not only the expenses immediately incident to pregnancy and birth but all the reasonable costs of maintaining and supporting the child during his minority. The court was careful to point out that the awardable damages were not for the new life as such but rather for the diminution in the family wealth that necessarily resulted in a hardship to the other members of the family. Rejecting the argument that an award of damages could reduce the child to an "emotional bastard," the court found that the possibility of psychological harm was no greater than in any other case where a child learns that his existence is the result of his parents' ineptitude at birth control. Most persuasively, the court observed that modern attitudes with respect to family establishment and the use of contraceptives had changed, and further insinuated that the birth of an unplanned child may now be viewed by some as something less than a "blessed event."

The law with respect to damages was subsequently refined with more precision in

the analogous case of *Troppi v. Scarf*, 31 Mich.App. 240, 187 N.W.2d 511 (1971). Plaintiff, the mother of seven children, brought suit for damages against a pharmacist who had negligently filled her birth control prescription with tranquilizers, thus causing her to become pregnant with her eighth child. While the Michigan court was willing to permit recovery for the economic costs of rearing this child until the age of his majority, it emphasized that the amount of compensable damages awarded should be reduced by any benefits conferred upon the plaintiff by the child's birth. This so-called "benefit rule" was derived from Restatement, Torts, § 920, which provides:

> "Where the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred upon the plaintiff a special benefit to the interest which was harmed, the value of the benefit conferred is considered in mitigation of damages, where this is equitable."

Although the practical application of this rule would require the trier of fact to ascertain a dollar value for such speculative benefits as a child's services and companionship, the court noted that similar calculations were made in wrongful death actions where these elements are claimed not as benefits but as damages. It was also of no consequence, in this court's opinion, that the damages caused by the birth of a child were likely to be widely variable depending on the particular circumstances of his parents.

In the wake of the *Custodio* and *Troppi* cases, the controversy has continued over the awarding of damages for the economic costs of an unwanted child born after a negligently performed sterilization operation. A minority of courts have continued to adhere to the older view that all damages should be denied as a matter of law. See, *Terrell v. Garcia*, 496 S.W.2d 124 (Tex. Civ.App.1973), certiorari denied, 415 U.S.

927, 94 S.Ct. 1434, 39 L.Ed.2d 484 (1974). Cf. *Rieck v. Medical Protective Co. of Fort Wayne, Ind.*, 64 Wis.2d 514, 219 N.W.2d 242 (1974).[5] One jurisdiction has taken an intermediate position and has permitted recovery for all damages directly related to pregnancy and birth, including medical expenses, the mother's pain and suffering, and loss of consortium, but has denied damages for the care and maintenance of the child after birth. See, *Coleman v. Garrison*, Del., 349 A.2d 8 (1975). A growing majority of courts have allowed recovery for all damages proximately caused by the physician's negligence, including the cost of rearing the child during his minority. These courts have ordinarily required that damages be reduced by any benefits conferred by the child through an application of the "benefit rule." See, e. g., *Stills v. Gratton*, 55 Cal.App.3d 698, 127 Cal.Rptr. 652 (1976); *Anonymous v. State*, 33 Conn.Sup. 126, 366 A.2d 204 (1976); *Betancourt v. Gaylor*, 136 N.J.Super. 69, 344 A.2d 336 (1975); *Bowman v. Davis*, 48 Ohio St.2d 41, 356 N.E.2d 496 (1976).

■ Pretermitting moral and theological considerations, we are not persuaded that public policy considerations can properly be used to deny recovery to parents of an unplanned, healthy child of all damages proximately caused by a negligently performed sterilization operation. Analytically, such an action is indistinguishable from an ordinary medical negligence action where a plaintiff alleges that a physician has breached a duty of care owed to him with resulting injurious consequences. Where the purpose of the physician's actions is to prevent conception or birth, elementary justice requires that he be held legally responsible for the consequences which have in fact occurred.[6] While other courts have referred to a negligent sterilization case as a "wrongful birth" action, we

---

**5.** Courts in both Texas and Wisconsin have apparently been more willing to allow damages when a child is born with congenital deformities. See, *Jacobs v. Theimer*, 519 S.W.2d 846 (Tex.1975); *Dumer v. St. Michael's Hospital*, 69 Wis.2d 766, 233 N.W.2d 372 (1975). Both of

these cases involved the negligent failure of physicians to diagnose rubella in pregnant mothers, with the result that they did not undergo abortions to terminate their pregnancies.

**6.** Prosser, Torts (4 ed.) §§ 41 and 42.

believe that this type of case is more properly denominated an action for "wrongful conception," for it is at the point of conception that the injury claimed by the parents originates. It should be further emphasized that this cause of action is exclusively that of the parents, since it is they and not the unplanned child who have sustained both physical and financial injury by the physician's negligence.[7]

Viewed in this manner, the parents of an unplanned child should at least be entitled to recover all damages immediately incident to pregnancy and birth. The allowance of these damages, we believe, is wholly consistent with the elementary principle of compensatory damages which seeks to place injured plaintiffs in the position that they would have been in had no wrong occurred. See, *Sorenson v. Cargill, Inc.*, 281 Minn. 480, 163 N.W.2d 59 (1968); 5B Dunnell, Dig. (3 ed.) § 2570. Incidental damages include such items as prenatal and postnatal medical expenses, pain and suffering incurred by the child's mother, and loss of consortium to the extent that it can be proved under the guidelines set forth in *Thill v. Modern Erecting Co.*, 284 Minn. 508, 170 N.W.2d 865 (1969).

Most troublesome is the matter of allowing recovery for the costs of rearing a normal, healthy child. Ethical and religious considerations aside, it must be recognized that such costs are a direct financial injury to the parents, no different in immediate effect than the medical expenses resulting from the wrongful conception and birth of the child. Although public sentiment may recognize that to the vast majority of parents the long-term and enduring benefits of parenthood outweigh the economic costs of rearing a healthy child, it would seem myopic to declare today that those benefits exceed the costs as a matter of law. The use of various birth control methods by millions of Americans demonstrates an acceptance of the family-planning concept as an integral aspect of the modern marital relationship, so that today it must be acknowledged that the time-honored command to "be fruitful and multiply"[8] has not only lost contemporary significance to a growing number of potential parents[9] but is contrary to public policies embodied in the statutes encouraging family planning.[10] Recent decisions of the United States Supreme Court, moreover, seem to suggest that the right to limit procreation is of a constitutional dimension. See, *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Compensatory damages for the cost of rearing the child to the age of majority would also, in our opinion, serve the useful purpose of an added deterrent to negligent performance of sterilization operations. See, Prosser, Torts (4 ed.) § 4, p. 23. It may not only reinforce the physician's duty of due care from the outset of the physician-patient relationship but also, from a medical viewpoint, support the position of those doctors who refuse to perform nontherapeutic sterilizations "on demand" on the

---

7. See, footnote 3, *supra*. Similarly, it could be argued that the siblings of an unplanned child are not entitled to sue for damages resulting from a diminution of either the family wealth or their share of parental love and affection. See, *Aronoff v. Snider*, 292 So.2d 418 (Fla.App. 1974).

8. See, Genesis 1:28.

9. During the first 5 years of this decade, it has been estimated that 3,566,000 men voluntarily chose to be sterilized in the United States. See, Lombard, *Vasectomy*, 10 Suffolk L.Rev. 25. Recent studies also indicate that sterilization is rapidly becoming the preferred method of birth control among married persons. Statistical data compiled in 1975 revealed that 6.8 million couples had chosen sterilization (either of the husband or wife) for birth control, while only 7.1 million married women were still using birth control pills. See, *Sterilization Becoming Top Birth Control*, The Minneapolis Star, July 22, 1977, p. 1A, col. 1.

10. See, e. g., Minn.St. 617.25 which legalizes the sale, distribution, or advertisement of instruments, articles, drugs, or medicines for the prevention of contraception, by persons authorized therein. See, also, the Community Health Services Act, Minn.St. 145.911 to 145.922, providing a state subsidy to local units of government for community health services including family planning services under state guidelines and standards.

ground that such sterilizations "frequently constitute a serious abuse of surgical license." See, 2 Louisell and Williams, Medical Malpractice, § 19.11. Lastly, in the absence of a legislatively granted immunity or declared public policy governing sterilization, we remain unconvinced that a physician should be held harmless for the economic costs of supporting an unplanned child. Thus, in obedience to the rule of law, we feel compelled to conclude that where the parents of an unplanned, healthy child choose to include this item of damages in their claim, hopefully after being advised of the psychological consequences which could result from litigating such claim, we will permit them to recover the reasonably foreseeable costs of rearing, subject to an offset for the value of the benefits conferred to them by the child.

Computation of rearing costs must begin with an assessment of the reasonably foreseeable expenses that will be incurred by the parents to maintain, support, and educate their child. In the case of a normal, healthy child, we would anticipate that these expenses could not ordinarily be projected beyond the age of his majority, for it is at that age that the parental duty to support ceases.[11] In keeping with the "same interest" limitation of Restatement, Torts, § 920, *supra*, and its underlying purpose to prevent unjust enrichment, the trier of fact will then be required to reduce these costs by the value of the child's aid, comfort, and society which will benefit the parents for the duration of their lives.[12] While we recognize that the dollar value of the benefits to be offset is difficult to assess, we have routinely allowed recovery for the loss of aid, comfort, and society in wrongful death actions where similar problems of proof are presented. See, *Sellnow v. Fahey*, 305 Minn. 375, 233 N.W.2d 563 (1975); *Fussner v. Andert*, 261 Minn. 347, 113 N.W.2d 355 (1961).[13] It is also our view that the refusal of a mother to submit to an abortion or of the parents to give their child up for adoption should not be regarded as a failure on the part of the parents to mitigate damages.

To assist the jury in measuring the various and complex elements of damage, we finally require that all future actions for wrongful conception be submitted to the jury with a special verdict form along with explanatory instructions.[14] Coupled with these precautions should be a strict judicial scrutiny of verdicts to prevent excessive awards.

In the present case, the jury awarded the Sherlocks damages upon general instructions of negligence and without the aid of a special verdict form. The jury was also not specifically instructed to offset the value of the child's aid, comfort, and society against the projected rearing costs. Because of these errors, we are compelled to reverse, and remand for a new trial limited solely to the issue of damages.

The result we reach today is at best a mortal attempt to do justice in an imperfect world. In this endeavor we are not un-

---

11. Cf. *LaBelle v. LaBelle*, 302 Minn. 98, 223 N.W.2d 400 (1974); *Mund v. Mund*, 252 Minn. 442, 90 N.W.2d 309 (1958). Should the unplanned child be born with congenital deformities, the parental support obligation could of course extend beyond the date that the child reaches his majority. See, *McCarthy v. McCarthy*, 301 Minn. 270, 222 N.W.2d 331 (1974).

12. Our only reason for valuing the benefits of the child's aid, comfort, and society against the life expectancy of his parents is that in the usual case pecuniary benefits will be minimal during the child's minority. This approach is, moreover, consistent with the opposite situation encountered in an action for the wrongful death of a minor where, according to the pre-

vailing view, parents may recover the value of the benefits they might reasonably have expected from the child after reaching majority. 1 Speiser, Recovery for Wrongful Death 2d, § 4.26. Cf. *Luther v. Dornack*, 179 Minn. 528, 229 N.W. 784 (1930). Should the child's life expectancy for some reason be less than that of his parents, the value of the benefits conferred would necessarily be computed for the expected duration of his life.

13. See, 4 Hetland & Adamson, Minnesota Practice, Jury Instruction Guides (2 ed.) JIG II, 180 S.

14. See, *Martineau v. Nelson*, Minn., note 18, 247 N.W.2d 409, 417 (1976).

mindful of the deep and often times painful ethical problems that cases of this nature will continue to pose for both courts and litigants.[15] It is therefore our hope that future parents and attorneys would give serious reflection to the silent interests of the child and, in particular, the parent-child relationships that must be sustained long after legal controversies have been laid to rest.[16]

No costs or disbursements are allowed to either party.

Affirmed in part, reversed in part, and remanded.

SHERAN, Chief Justice (dissenting).

The majority decision permits the parents of a healthy child to recover from a physician who performs an ineffective vasectomy the reasonable foreseeable costs of rearing, subject to an offset for the value of benefits conferred on them by the child. I dissent upon the ground that the worth of a healthy child to his parents will always exceed these costs. This view has the support of such decisions as *Gleitman v. Cosgrove*, 49 N.J. 22, 227 A.2d 689, 22 A.L.R.3d 1411 (1967), and cases cited therein. See, also, Annotation, 22 A.L.R.3d 1441. It is also consistent with the reasoning of the Minnesota Supreme Court in *Christensen v. Thornby*, 192 Minn. 123, 255 N.W. 620, 93 A.L.R. 570 (1934). Although the paragraph from the *Christensen* case which is quoted in the majority opinion may be characterized as dictum, it is significant that a unanimous court apparently considered it preposterous for the father of an unplanned child to be awarded damages in a case such as this for the cost of nurture and education of the child during its minority.

15. The dissent embodies the view that on the ground of moral values the birth of a healthy child should always be regarded as a "gift" of incalculable benefit to his parents, who would not therefore seek to recover the cost of rearing in a case such as this. Those of us, including the writer of this opinion, who share that view can only offer our expectations that parents will, by reason of the limitations on recovery of the cost of rearing, be dissuaded from

Only 3 years ago, in *Pehrson v. Kistn...* 301 Minn. 299, 303, 222 N.W.2d 334, 3... (1974), we said, in a wrongful-death action, " * * * [I]t is difficult to visualize a case where a human being does not have some monetary value in addition to [pecuniary] damages incurred by next of kin." In so far as the majority decision permits parents to recover damages by proving their healthy child a net burden to them, it is contrary to public policy, in my judgment. We should not permit the courts to be used for this purpose. I would direct the trial court to enter judgment for the defendant.

PETERSON, Justice (dissenting).

I join in the dissent of the Chief Justice.

OTIS, J., took no part in the consideration or decision of this case.

WAHL, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

regarding that item of damages as the primary and most significant basis for instituting suit.

16. See, A. B. A. Code of Professional Responsibility, EC 7–10 (adopted August 4, 1970, 286 Minn. ix): "The duty of a lawyer to represent his client with zeal does not militate against his concurrent obligation to treat with consideration all persons involved in the legal process and to avoid the infliction of needless harm."