Simin Y. HICKMAN and Chris A. Hickman, individually and as parents and natural guardians of Jessica Hickman, Respondents,

v.

GROUP HEALTH PLAN, INC., et al., Appellants,

State of Minnesota, Intervenor.

No. C2–85–2013.

Supreme Court of Minnesota.

Oct. 24, 1986.

Terence O'Loughlin, Richard J. Thomas, Audrey A. Zibelman, St. Paul, for appellants.

Ann L. Russell, Sp. Asst. Atty. Gen., St. Paul, for intervenor State.

Terry L. Wade, David McKenna, St. Paul, for respondents.

Joseph T. O'Neill, Christine L. Meuers, Michelle D. McQuarrie, St. Paul, for Minnesota Conference of Catholic Health Facilities & Minnesota Catholic Conference.

J. Stuart Showalter, Brian L. Andrew, St. Louis, Mo., for Catholic Health Assoc. of U.S.

D. Kevin Ikenberry, Manassas, Va., for Rutherford Institute.

Maura K. Quinlan, Chicago, Ill., for Americans United for Life.

Walter M. Weber, Milwaukee, Wis., for Catholic League for Religious & Civil Rights.

James Bopp, Jr., Kristin S. Miles, Terre Haute, Ind., for Nat. Right to Life Committee.

Heard, considered, and decided by the court en banc.

YETKA, Justice.

This case comes to us as a certified question from the Hennepin County District Court. The issue to be determined is the constitutionality of Minnesota's wrongful birth statute, Minn.Stat. § 145.424, subd. 2 (1984). The district court, in ruling on cross motions for partial summary judgment, struck down the wrongful birth statute as unconstitutional under *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Noting the significance of this question, however, pursuant to Minn.R.Civ. App.P. 103.03(h), the district court certified it to us as important and doubtful.

The question posed by the district court is whether Minn.Stat. § 145.424 is constitutional under the United States and Minnesota Constitutions. We answer the certified question by upholding the statute's constitutionality and reversing the district court.[1]

## I.

On January 28, 1984, Simin Hickman gave birth to her first child, Jessica. Jessica was born with Down's syndrome, a genetic disease also known as mongolism. At the time Simin became pregnant, she was 34 years old. Simin's obstetrician, Dr. Leslie Sharpe, had cared for her throughout her pregnancy. Because of her age, Simin's chances of bearing a genetically abnormal child were significantly increased. The risk of a 35-year-old woman bearing a Down's syndrome child is said by medical experts to be 1 in 350. By contrast, the risk of a woman in her 20's bearing a Down's syndrome child is between 1 in 1,000 to 1 in 2,000.

The parties dispute whether Dr. Sharpe ever offered to test Simin's fetus for Down's syndrome. Simin alleges that neither Dr. Sharpe nor Group Health offered her the option of testing for Down's syndrome. She also asserts that, when she independently learned of such testing and requested it, Dr. Sharpe advised her such testing was not necessary in her case. Dr. Sharpe, however, denies these claims. He alleges that he offered such testing to Simin after explaining the risks of Down's syndrome and certain risks involved in the testing itself, but that she declined such testing.

The typical procedure used to test for Down's syndrome is an amniocentesis. The procedure involves inserting a large needle into the mother's womb and withdrawing some amniotic fluid. The fluid is then tested to reveal the presence of Down's syndrome. The procedure, however, does involve some risk of injury. The chances of fetal death due to amniocentesis are between 1 in 100 and 1 in 200. Also, amniocentesis typically cannot be performed until the 16th week of pregnancy because insufficient amniotic fluid exists before that time. The testing for Down's syndrome takes approximately 4 weeks after the fluid is withdrawn.

The Hickmans brought the present suit against Dr. Sharpe and Group Health after Jessica's birth. They assert that, had they known of Jessica's condition as a fetus, they would have chosen abortion. They alleged several causes of action on behalf

---

**1.** The attorney general intervened on behalf of the state. The court also granted amicus curiae status to seven other organizations not originally parties to this action. Six filed amicus briefs. These include: Americans United for Life Legal Defense Fund, the Catholic Health Association of the United States, the Catholic League for Religious and Civil Rights, the Minnesota Conference of Catholic Health Facilities and the Minnesota Catholic Conference, the National Right to Life Committee, Inc., and the Rutherford Institute.

of themselves individually based on negligence, misrepresentation, breach of a fiduciary duty, and failure to inform. They also asserted a cause of action on behalf of Jessica based on negligence. Dr. Sharpe and Group Health specifically denied the allegations and raised as a defense the statutory prohibitions against wrongful birth and wrongful life actions found in Minn.Stat. § 145.424, subds. 1, 2 (1984).

The Hickmans moved for partial summary judgment. They argued that subdivisions 1 and 2 of section 145.424: (1) unconstitutionally restricted Simin's right to an abortion under *Roe v. Wade*, (2) violated Simin's equal protection rights under both the United States and Minnesota Constitutions, and (3) violated Simin's rights under article 1, section 8 of the Minnesota Constitution, guaranteeing a remedy for every wrong. Dr. Sharpe and Group Health also moved for partial summary judgment, raising the statutory prohibitions in Minn.Stat. § 145.424, subds. 1, 2 as a bar to the Hickmans' action. For a proper understanding of the issues raised, we deem it convenient to set out in full section 145.424 of the statute in question.

**145.424 PROHIBITION OF TORT ACTIONS.**

Subdivision 1. **Wrongful life action prohibited.** No person shall maintain a cause of action or receive an award of damages on behalf of himself based on the claim that but for the negligent conduct of another, he would have been aborted.

Subd. 2. **Wrongful birth action prohibited.** No person shall maintain a cause of action or receive an award of damages on the claim that but for the negligent conduct of another, a child would have been aborted.

Subd. 3. **Failure or refusal to prevent a live birth.** Nothing in this section shall be construed to preclude a cause of action for intentional or negligent malpractice or any other action arising in tort based on the failure of a contraceptive method or sterilization procedure or on a claim that, but for the negligent conduct of another, tests or treatment would have been provided or would have been provided properly which would have made possible the prevention, cure, or amelioration of any disease, defect, deficiency, or handicap; provided, however, that abortion shall not have been deemed to prevent, cure, or ameliorate any disease, defect, deficiency, or handicap. The failure or refusal of any person to perform or have an abortion shall not be a defense in any action, nor shall that failure or refusal be considered in awarding damages or in imposing a penalty in any action.

Minn.Stat. § 145.424 (1984).

The district court granted the Hickmans' motion with respect to the wrongful birth statute in subdivision 2, finding it unconstitutional under *Roe*.[2] The court reasoned that *Roe* and the cases following it established more than just a woman's right to an abortion; it established the broader right to decide whether to terminate her pregnancy within the context of the doctor-patient relationship. Minn.Stat. § 145.424, subd. 2 unconstitutionally interfered with this right because it allowed a doctor to withhold information that might have helped her form a decision on abortion. The doctor could negligently withhold such information because subdivision 2 prohibited a patient from suing her doctor for wrongful birth based upon such negligence. By allowing significant information to be withheld regarding possible problems with a pregnancy, subdivision 2 impeded Simin's ability to make an informed decision concerning abortion. Therefore, subdivision 2 was, under *Roe*, held to burden significantly a woman's right to an abortion and, because appellants demonstrated no compelling state interest, the court struck down subdivision 2 as unconstitutional.

---

**2.** The court denied the Hickmans' motion with respect to the cause of action by Jessica for wrongful life. It upheld Minn.Stat. § 145.424, subd. 1 as constitutional. The Hickmans do not challenge this ruling on appeal.

## II.

Before addressing the Hickmans' constitutional challenges to subdivision 2, we find it helpful to discuss the legal basis of the wrongful birth cause of action. At common law, no cause of action existed for either wrongful birth or wrongful death. *See, e.g., Baker v. Bolton,* 170 Eng.Rep. 1033 (N.P.1808) (denying recovery for wrongful death); *Prosser and Keeton on the Law of Torts,* §§ 55, 125A (W. Keeton, D. Dobbs, R. Keeton & D. Owen 5th ed. (1984)). Instead of originating in the courts, wrongful death suits were first permitted by the passage of Lord Campbell's Act in the mid-nineteenth century. Lord Campbell's Act (fatal accidents act), 1846, 9 & 10 Vict., ch. 93. Wrongful death actions in Minnesota were also established by statute. 1858 Minn.Pub.St. ch. 68, § 3. Like wrongful death, wrongful birth presents a myriad of public policy problems, including difficulty in ascertaining damages, increased litigation, and distinguishing between legislative and judicial roles.[3] Annot., 83 A.L.R.3d 15 (1978 & Supp.1986). Because of these problems and the fact that no such action exists at common law, we consider the establishment of wrongful birth or wrongful life suits to be best within the exclusive jurisdiction of the legislature. In Minn.Stat. § 145.424, the legislature has made its intent clear: no wrongful birth or wrongful life suits are to be permitted. The legislature has now spoken on the subject and, barring constitutional violations, that should end the matter.

Respondents argue that section 145.424, subdivision 2 is unconstitutional under *Roe v. Wade,* the Fourteenth Amendment to the United States Constitution, and article 1, section 8 of the Minnesota Constitution.[4] This court presumes that a statute is constitutional unless it is proven otherwise beyond a reasonable doubt. *Minnesota Higher Education Facilities Authority v. Hawk,* 305 Minn. 97, 232 N.W.2d 106 (1975). We exercise our power to declare a statute unconstitutional only when absolutely necessary. *Minneapolis Gas Co. v. Zimmerman,* 253 Minn. 164, 91 N.W.2d 642 (1958). In our opinion, respondents did not meet their burden of proof.

First, we do not believe that the due process and equal protection clauses of the Fourteenth Amendment apply to this case. Prerequisite to a possible violation of the Fourteenth Amendment is state action or involvement. *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). How can it be argued that state action is involved in this case? The relationship here is strictly between doctor and patient. The statute does not forbid the doctor to inform the patient of new tests and the risk they entail. It does not directly touch on the expectant mother's right to choose an abortion. Due process does not require that the state adopt regulations prohibiting purely private conduct. *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982).

Second, even if there were sufficient state action, the United States Supreme Court has clearly held to the rule that, in order to be in violation of *Roe v. Wade,* the state must directly affect or impose a significant burden on a woman's right to an abortion. *See Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977); *Planned Parenthood Ass'n v. Ashcroft,* 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983). Thus, in its most recent decision, the court invalidated laws that forced doctors to provide clients with information discouraging abortion and to use medical procedures that could put maternal health at risk for the benefit of a fetus. *Thornburgh v. American College of Obstetricians and Gynecologists,* — U.S. —,

---

**3.** Technically, wrongful birth and life actions are a form of negligence while wrongful death is a separate tort based on intentional acts, negligence or strict liability. *See Prosser* at §§ 55, 125A–26. The torts, however, involve strikingly similar policy considerations and have a similar history.

**4.** Respondents do not press the issue concerning the constitutionality of subdivision 1, which prohibits an action for wrongful life. As a matter of fact, at oral argument, they all but conceded its validity.

106 S.Ct. 2169, 90 L.Ed.2d 779 (1986). Other statutes held unconstitutional have given third parties the arbitrary right to veto the woman's choice. *See Planned Parenthood v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); *Colautti v. Franklin*, 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979). Unlike these statutes, section 145.424, subdivision 2 does not directly interfere with the woman's right to choose a safe abortion. The two parties, doctor and patient, are still left free to make whatever decision they feel is appropriate.

Furthermore, section 145.424, subdivision 3, allowing a cause of action for wrongful conception suits, does not present an equal protection problem. No suspect or quasi-suspect classification is involved, and the state has a rational basis for distinguishing a situation where a parent decides to be sterilized and the doctor negligently performs the operation from one where the parents decide to assume certain well-known risks in childbearing and then want to sue the physician for the realization of the possible consequences.[5] Most adults are fully aware of the risks of childbearing when the mother is over 30 years old. In our opinion, plaintiffs stretched the United States Supreme Court abortion cases to the breaking point. Parents here were as cognizant of the risks of a late pregnancy as were the doctors. How can it be said that the plaintiffs' right to an abortion, therefore, was in anyway impaired? These parents should not be allowed to take the risk and then sue the doctor for the consequences. What is the doctor's choice? By advising the patient about amniocentesis, appellant contends that there is as high as a 1 to 100 chance that the fetus will be injured if the patient elects to have the test; by not advising about the test, there is as high as a 1 in 350 chance that the

child will be born with mental or physical defects. With either alternative, the doctor would be subject to a possible suit. How could the court require the state to provide a cause of action against a doctor faced with this Hobson's choice? Doctors can perform what many lay people consider to be miracles today due to advancements in medical technology, but we cannot and should not place the doctor in an impossible situation, interfering with and perhaps thwarting his or her professional judgment.

We are fully aware of the situation that existed a mere quarter of a century ago when physicians' actions were scarcely ever challenged and there was very little or any accountability to anyone for decisions that they made. Those times have changed. The pendulum has now swung to the opposite extreme. Simply put, doctors must be returned some leeway in exercising judgment affecting the treatment of their patients without the fear of legal sanction.

■ Finally, article I, section 8 of the Minnesota Constitution only assures remedies for rights that vested at common law. The purpose of the section is to protect common law rights and remedies for which the legislature has not provided a reasonable substitute. *See Haney v. International Harvester Co.*, 294 Minn. 375, 201 N.W. 140 (1972); Mickelsen, *The Use and Interpretation of Article I, Section Eight of the Minnesota Constitution 1861–1984*, 10 Wm. Mitchell L.Rev. 667 (1984).

In summary, we do not believe that the mother's right to abortion is the real issue in this case. The issue is whether the state has a right to decide what action or inaction on the part of one person is actionable by another in the courts of this state. It is illogical to us for the courts to declare that

---

5. Subdivision 3 was obviously intended to preserve the result of our decision in *Sherlock v. Stillwater Clinic*, 260 N.W.2d 169 (Minn.1977). Respondents argued that, since subdivision 3 permits a cause of action for wrongful conception, an action for wrongful birth must also be permitted. Respondents, however, miss the point that, at the time this court decided the

*Sherlock* case, section 145.424 did not exist. In *Sherlock*, the court was operating under the theory that wrongful conception was merely a form of malpractice. In light of the legislative intent embodied in section 145.424, subdivisions 1 and 2, our reasoning in *Sherlock* may, perhaps, have been erroneous.

a cause of action exists in instances where the legislature clearly and unequivocally has said there is none. To the extent that we held in the *Sherlock* case that a cause of action for wrongful conception existed, it must be borne in mind that that case was written prior to action by the legislature. Moreover, if the plaintiff has the right to invoke equal protection, does it follow that, if a statute has three sections, two of which specifically deny a cause of action and the third merely codifies the existence of an earlier decision of this court made prior to the express will of the legislature, this court must hold the two sections invalid on the basis of section three? We think not. The legislative intent is clear and if any section of the statute is open to question, it would most likely be section three rather than the previous two sections.

Through Minn.Stat. § 145.424, the legislature has spoken concerning the existence of wrongful birth and wrongful life suits in this state. Respondents have not shown beyond a reasonable doubt that the statute violates any provision of the federal or state constitution. Therefore, we uphold the statute and reverse the district court.

SIMONETT, KELLEY and COYNE, JJ., concur specially.

AMDAHL, C.J., and WAHL and SCOTT, JJ., dissent.

SIMONETT, Justice (concurring specially).

I join the majority opinion and add these further observations.

The doctor breaches a duty to inform the patient of a pertinent medical test. The patient says that but for the doctor's negligence she would have chosen to take the test and would then have further chosen a particular course of treatment that would have avoided the harm sustained. So stated, the wrongful birth action seemingly resembles an ordinary, common law medical malpractice action. A closer look, however, reveals differences. A wrongful birth action, by its use of "but for" causation, requires a woman who delivers a handicapped baby to choose hypothetically, post facto, whether or not to have an abortion. If one plaintiff says she would have had an abortion, she can sue the doctor. If another plaintiff says she would not have had an abortion, she cannot sue. Both women exercise their right of choice, both have a handicapped child, but only one has a cause of action for compensatory damages. The woman who chooses not to have an abortion is penalized unless one assumes, contrary to the assumption of the wrongful birth rationale, that the birth of a handicapped child is not an injurious harm cognizable in tort law. Then, too, the hypothetical exercise of selecting a course of treatment is troublesome. Compare *Kuchenmeister v. Illinois Farmers Insurance Co.*, 310 N.W.2d 86, 89 (Minn.1981), where we said the fact issue whether an insured would have purchased insurance if offered by the insurer was "too speculative," and the law would assume the insured would have bought the insurance. But here, if it were presumed all plaintiffs would hypothetically choose abortion, the right to choose—which is what is constitutionally protected—would be obliterated.

Our purpose here, however, is not to argue the merits of a wrongful birth action but only to suggest the dynamics of the proposed action are as legally complex as they are personally agonizing. This much is clear. A tort of wrongful birth is not an accepted part of existing common law but would be something new. Common law tort liability involves more than the mechanical application of generic tort rules; rather, the application of tort rules to create new tort liability depends on the social, cultural, and religious concerns of the people, concerns which a legislature under our system of government is especially designed to reflect.

The issue before us, we should remember, is not whether the court should recognize a new common law cause of action. That issue has been preempted by the legislature. Minn.Stat. § 145.424, subd. 2 (1984), provides: "No person shall maintain a cause of action or receive an award of damages on the claim that but for the

negligent conduct of another, a child would have been aborted." Absent interference with a constitutional right, a legislature is free to decide whether or not to recognize a wrongful birth action.

### I.

Not every duty owed not to injure people gives rise to a tort suit for money damages.[1] In this case, however, plaintiffs contend failure to provide a suit for money damages against a negligent doctor is an intrusion on a constitutional right. They argue the Minnesota statute eliminates what the trial court calls "a significant disincentive" for a doctor to practice medicine nonnegligently. They also argue section 145.424, subd. 2, allows a doctor to withhold information that may help the patient to make an informed decision on abortion and this interferes with a woman's exercise of her constitutional rights under *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

It is, however, disingenuous to say the statute "allows" a doctor to withhold information. The statute neither allows nor disallows. A doctor has a well-recognized professional duty to provide a patient with information necessary for any medical treatment decision, including a decision on abortion. Indeed, in this case, notwithstanding section 145.424, the defendant doctor recognized his duty to inform plaintiffs about amniocentesis, a duty imposed by the standards of medical practice and the code of medical ethics, and a duty subject to intraprofessional sanctions. The statute does not interfere with this duty. There are no "intrusive informational prescriptions." *Thornburgh v. American College of Obstetricians and Gynecologists,* — U.S. ——, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986). If a doctor, for reasons of personal ethics, does not wish to be involved in a patient's abortion decision-making, he is ethically bound to refer the patient elsewhere for the medical care the patient is entitled to receive; and if the doctor refuses to make the referral, his intentional conduct would not be protected by section 145.424.

If doctors know they can be sued for money damages, presumably they will be more likely to practice medicine carefully. Presumably, too, doctors try to be careful whether or not they can be sued. But in an imperfect world, even with lawsuits, people will still be careless.[2] This is not to denigrate the tort remedy, but only to observe the indirect and problematic consequences of the absence of a tort deterrent does not constitute a direct impact that intrudes on a person's constitutional right to choose whether or not to have an abortion.

---

1. *E.g., Holmquist v. Miller,* 367 N.W.2d 468 (Minn.1985) (a social host has a duty not to furnish intoxicating liquor to an obviously intoxicated guest, but, by reason of legislative preemption, no tort action for damages by an injured person will lie against the host); *Olson v. Ische,* 343 N.W.2d 284 (Minn.1984) (a passenger may have a duty to others to discourage a reckless driver from driving but the duty is not legally cognizable). One who transports a child in a motor vehicle failing to use a passenger restraint system breaches a duty recognized by the criminal law (making such failure a misdemeanor) but this failure cannot be the basis of a suit for money damages. Minn.Stat. § 169.685 (1984).

   In *Salin v. Kloempken,* 322 N.W.2d 736 (Minn. 1982), this court declined to recognize a common law tort remedy for a child's loss of parental consortium resulting from injuries negligently inflicted on the parent by a negligent third party. The court cited various policy reasons, adding, "The intangible nature of the child's loss makes it difficult to assess damages and provides a further reason against judicial recognition of the cause of action." *Id.* at 740.

2. In 1970 the Institute for Social Research at the University of Michigan made a study of public attitudes toward auto insurance for the United States Department of Transportation. One survey question was whether tort liability for damages influences people's driving behavior. Of the persons responding, 14% said yes, 17% said liability had some influence, 58% said liability makes no difference, and the remaining 11% either did not know or their answer could not be ascertained. Nearly 70% of the respondents who had some accident experience felt liability had no effect on a person's driving. *Public Attitudes Toward Auto Insurance,* A Report of the Survey Research Center, Institute for Social Research, The University of Michigan, to the Department of Transportation 67–68 (March 1970).

At what point does state interference with the exercise of plaintiff's constitutional right arise? The United States Supreme Court, in other situations, has required a "direct" impact on the woman's abortion decisionmaking, *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), or a "significant burden," *Planned Parenthood Ass'n v. Ashcroft*, 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983). Or, put another way, "although government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those not of its own creation." *Harris v. McRae*, 448 U.S. 297, 316, 100 S.Ct. 2671, 2687, 65 L.Ed.2d 784 (1980). But here, if the doctor's inadvertence or carelessness places an obstacle in the path of plaintiff's abortion decisionmaking, it is placed there by the doctor, not the state. The doctor, not the state, is precluding the patient from making an informed abortion decision. Nor is the doctor's conduct, which is negligence, a form of private discrimination. A doctor who inadvertently fails to provide certain treatment is not engaged in invidious partiality; he is only failing to use due care.

Putting the issue another way, there is, as the majority opinion explains, a lack of "state action." Unlike the state action found in *Reitman v. Mulkey*, 387 U.S. 369, 380–81, 87 S.Ct. 1627, 1633–34, 18 L.Ed.2d 830 (1967), Minn.Stat. § 145.424 does not authorize nor is it intended to authorize action which discriminates or interferes with a woman's right to an abortion. In the absence of state action, plaintiffs' constitutional right under the 14th amendment to make an informed abortion decision is not involved. Neither can plaintiffs' effort to create a constitutionally mandated tort remedy under article 1, section 8 of the Minnesota Constitution (a legal remedy for every wrong) be successful. As the majority opinion holds, and without disagreement from the dissent, there is no violation of this section of our constitution.

## II.

Plaintiffs argue section 145.424 violates the equal protection clause because subdivision 2 denies a cause of action for wrongful birth while subdivision 3 allows a cause of action for wrongful conception. Plaintiffs contend the statute "permits a wrongful birth cause of action based upon negligence in connection with sterilization or birth control practices but denies a cause of action based upon negligence frustrating the abortion decision."

As explained above, section 145.424 does not implicate plaintiffs' constitutional right to make an informed decision on abortion. Consequently, the rational basis test applies to plaintiffs' equal protection claim. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464, 101 S.Ct. 715, 723, 66 L.Ed.2d 659 (1981). In 1977 this court recognized a wrongful conception action. *Sherlock v. Stillwater Clinic*, 260 N.W.2d 169 (Minn.1977). In 1982, the Minnesota Legislature enacted section 145.424. In subdivision 3 it did not "create" a new wrongful conception cause of action but simply recognized the existing common law under *Sherlock*. The legislature did, however, in subdivision 2, elect not to extend the rationale of *Sherlock* to create a new cause of action for wrongful birth.

While there are similarities between the two kinds of actions, there are also great differences, and these differences establish a rational basis for the legislature's action. In both cases, the plaintiff would not have had the child but for the negligence of the doctor, but the interests sought to be compensated are different. In the one case, there is the right not to conceive; in the other, there is the right not to give birth. In the one, it is the right not to have an unplanned child, while in the other it is the right not to have an unwanted child. In the one case, there is no hypothetical exercise of choice of treatment, while in the other case there is.

In *Sherlock*, the court was troubled by the moral and ethical interests involved in a wrongful conception suit. It recognized

the difficulties of reducing those interests to a claim for money. A majority of that court, somewhat hesitantly, allowed the cause of action, observing "[t]he result we reach today is at best a mortal attempt to do justice in an imperfect world." *Id.* at 176. In deciding not to extend the *Sherlock* rationale to a wrongful birth cause of action, the legislature could have decided the already perplexing problems of *Sherlock* would have been compounded and exacerbated and that a further tort remedy was not warranted.

KELLEY, Justice (concurring specially).

I join in Justice Simonett's special concurrence.

COYNE, Justice (concurring specially).

I join in Justice Simonett's special concurrence.

AMDAHL, Chief Justice (dissenting).

I respectfully dissent.

The legislature has expressly refused to recognize a claim for wrongful birth in this state. As the concurring opinion notes, the legislature is free to decide whether or not to recognize a wrongful birth action provided that its decision does not interfere with a constitutional right. The majority and concurring opinions hold that the legislature's refusal to recognize a cause of action for wrongful birth, Minn.Stat. § 145.424, subd. 2 (1984), is permissible in that the legislature's action does not interfere with any constitutional right. I disagree.

*Roe* established a woman's right to an abortion as a right of privacy founded in the first, fourth, fifth, ninth, and fourteenth amendments, as well as in the penumbra of the Bill of Rights. 410 U.S. at 152, 93 S.Ct. at 726. Although the limits of the right of privacy are not rigidly defined, the Court stated that "[t]his right of privacy * * * is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Id.* at 153, 93 S.Ct. at 726.

In my opinion, *Roe* protects the decisionmaking process involved in choosing or not choosing an abortion and allows a woman to make an informed choice concerning abortion. Where a state has acted to interfere with a woman's decisionmaking process, the state's action is unconstitutional. This point was clearly made in *Roe* and has been subsequently upheld in all cases where state regulation has affected the decisionmaking process. *See, e.g., City of Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 426–27, 103 S.Ct. 2481, 2490–91, 76 L.Ed.2d 687 (1983) (discussing the right to an abortion as it exists within the patient-physician relationship); *Planned Parenthood Ass'n v. Ashcroft,* 462 U.S. 476, 490–93, 103 S.Ct. 2517, 2524–26, 76 L.Ed.2d 733 (1983) (interpreting parental consent requirements for pregnant minors so as to find them constitutional); *Bellotti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (invalidating parental consent statute as unconstitutionally infringing pregnant minor's rights under *Roe* ); *Planned Parenthood v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (invalidating spousal consent statute under *Roe* because it impermissibly impedes upon woman's decision concerning abortion).

The majority and concurring opinions find no constitutional violation because they do not find state interference with the decisionmaking process protected by *Roe.* They reason that state action is present only where the state has placed affirmative obstacles in the path of a woman's rights under *Roe;* because subdivision 2 does not place affirmative obstacles in the path of a woman's rights under *Roe,* subdivision 2 does not constitute state action.

The majority and concurring opinions are unarguably correct in their conclusions that a litigant must demonstrate state involvement in order to support a claimed violation of a right under the fourteenth amendment. The concept of state action, however, is nebulous and defies precise definition. A state may become so significantly involved with private discrimination that its actions constitute state action. For

this reason, the United States Supreme Court has refused to attempt "the 'impossible task' of formulating an infallible test for determining whether the State 'in any of its manifestations,' has become significantly involved in private discriminations." *Reitman v. Mulkey,* 387 U.S. 369, 378, 87 S.Ct. 1627, 1632, 18 L.Ed.2d 830 (1967); *see Burton v. Wilmington Parking Authority,* 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961). Only by "sifting facts" and "weighing circumstances" on an individual basis can a court determine whether state action is involved. *Reitman,* 387 U.S. at 378, 87 S.Ct. at 1632.

The rights under *Roe* are decisionally based, and subdivision 2 constitutes an official interference with the decisionmaking process. While, facially, it is the doctor's conduct which deprives the woman of the information she needs to make an informed decision, the deprivation of the information carries with it the imprint of the state. *Roe* contemplates that a woman makes an informed decision within the setting of the doctor-woman relationship, *see Thornburgh v. American College of Obstetricians and Gynecologists,* — U.S. —, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986), and the entry of the state into that relationship has been found to be constitutionally impermissible under *Roe* and its progeny. Subdivision 2 constitutes a subtle entry into that relationship and interference with the informed decisionmaking process.

The possibility that a doctor will be held responsible for negligent conduct stands as a safeguard that the woman will be fully informed. The legislature's removal of the negligence action safeguard, while not preventing a woman from actually obtaining an abortion, does harm the complete exercise of a woman's rights under *Roe.* I see this as a direct infringement on the informed decisionmaking process as enunciated in *Roe.* This point has also been noted by other jurisdictions when considering whether to impose liability for wrongful birth. *See Robak v. United States,* 658 F.2d 471 (7th Cir.1981); *Phillips v. United States,* 508 F.Supp. 544 (D.S.C.1981); *Berman v. Allan,* 80 N.J. 421, 404 A.2d 8 (1979).

I find the cases cited in the majority and concurring opinions for their "no affirmative obstacle" argument distinguishable from the case at hand and not persuasive authority in this case. *Harris* and *Maher,* along with *Poelker v. Doe,* 432 U.S. 519, 97 S.Ct. 2391, 53 L.Ed.2d 528 (1977), did not involve state restrictions interfering with the abortion decisionmaking process. They involved monetary restrictions placed upon the rights of certain indigent persons to obtain abortions. These restrictions were upheld as constitutional because they did not directly interfere with the right of a woman to obtain an abortion; they merely encouraged an alternative activity consonant with legislative policy. Because no claim was made in those cases that the challenged restrictions infringed upon the informed decisionmaking of women, I find them distinguishable from our present case. Although the Court has been willing to allow restrictions on the right to an abortion that do not involve the decisionmaking process, *see Poelker v. Doe,* 432 U.S. 519, 97 S.Ct. 2391, 53 L.Ed.2d 528 (1977), it has been unwilling to uphold as constitutional any restrictions on the decisionmaking process that do not assist a woman in making a more informed decision. *See Danforth,* 428 U.S. at 65–75, 96 S.Ct. at 2839–44. Restrictions that circumvent the rights of a woman to make an informed decision on abortion, *see Bellotti,* 443 U.S. at 639–44, 99 S.Ct. at 3046–48, or that directly impede upon the decisionmaking process by imposing unnecessary requirements, *see City of Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 439–49, 103 S.Ct. 2481, 2497–2502, 76 L.Ed.2d 687 (1983), have been held unconstitutional.

Because I find that the fundamental right that *Roe* protects has been interfered with in this case, it is necessary to determine whether there exists a compelling state interest that would justify interference. Although appellants and the state posit several compelling interests, only two have been recognized as compelling under

*Roe:* (1) protecting the woman's health, and (2) protecting the potentiality of human life. Neither interest, however, is sufficiently compelling prior to viability of a fetus to justify the restriction imposed by subdivision 2.

The interest in protecting the health of the mother cannot be used to justify subdivision 2. I cannot accept as fact that physician negligence protects a woman's health. On the contrary, subdivision 2 would seem to endanger a woman's health by not discouraging the negligent withholding of medical information. Subdivision 2 cannot be justified on the basis that it protects and preserves the health of a woman seeking an abortion. Neither can subdivision 2 be justified on the basis that it protects the potential for human life. This interest does not become compelling until the fetus is viable. Prior to that time, a restriction on the right to an abortion cannot be based on protecting human life. After viability, the state's interest in preserving life becomes paramount and would justify the restriction imposed by subdivision 2. The present case, however, involves alleged negligence on the part of Dr. Sharpe that took place prior to viability. The amniocentesis procedure Simin sought is performed well within the second trimester. Because no compelling state interest exists that would justify upholding subdivision 2 as constitutional, the statute must fail under *Roe* as an unconstitutional restriction on a woman's right to an abortion prior to viability.

I would find subdivision 2 unconstitutional for negligence occurring prior to viability. It places an obstacle in the path of a woman's decision under *Roe*. Such obstacle cannot withstand constitutional scrutiny. I would affirm the decision of the Minnesota Court of Appeals and of the Hennepin County District Court.

By way of a final comment, the special concurrence notes that section 145.424, subd. 2, does not protect a doctor's intentional conduct. Subdivision 3 of the statute, enacted at the same time as subdivision 2, contains the phrase "intentional or negligent malpractice" (Minn.Stat. § 145.-424, subd. 3 (1984)), whereas subdivision 2 only precludes a claim based on "negligent conduct." From a comparison of these sections, we can infer that the legislature understood the difference between intentional and negligent conduct and intended to preclude only a wrongful birth action based on negligent conduct.

WAHL, Justice (dissenting).

I join in Chief Justice Amdahl's dissent.

SCOTT, Justice (dissenting).

I join in Chief Justice Amdahl's dissent.